Petition of **DIESEL TANKER A. C. DODGE, Inc.,** owner of **THE Motor Vessel A. C. DODGE and Spentonbush Fuel Transport Service, Inc.,** for exoneration from or limitation of liability.

Civ. A. 19971.

United States District Court
E. D. New York.

July 6, 1955.

As Corrected on Motion to Resettle the Findings and Conclusions
Sept. 30, 1955.

See also, D.C., 117 F.Supp. 216.

Foley & Martin, New York City, Christopher E. Heckman and John H. Hanrahan, Jr., New York City, of counsel, for petitioners.

Haight, Gardner, Poor & Havens, New York City, MacDonald Deming, James M. Estabrook and Gordon W. Paulsen, New York City, of counsel, for The Michael.

Brenner, Hannan & Murphy, New York City, Lawrence H. Reilly, Jr., and Timothy V. Smith, New York City, of counsel, for various death and personal injury claimants.

Bernard Rolnick, New York City, for Palter and Kosinsky damage claims.

Greenhill & Greenhill, New York City, and Freedman, Landy & Lorry, Philadelphia, Pa., William Alper, Philadelphia, Pa., of counsel, for various death and personal injury claimants.

Thomas M. Breen, New York City, for various death and personal injury claimants.

BYERS, District Judge.

This is a limitation proceeding resulting from the sinking of the laden tanker Dodge by the laden tanker Michael on May 25, 1952 at about 10:30 p. m. D. S. T. in the upper Delaware River, some miles northerly of its entrance into Delaware Bay. The Michael struck the Dodge about 25 feet forward of her stern on the port side, at an estimated angle of 45 degrees.

The collision caused an explosion upon the Dodge at once, and in the ensuing fire on that ship all hands save one perished, and the ship went down by the stern to the bottom within a few minutes—estimated at three. The fire did not burn itself out for several hours, presumably because the forward floating part of the hulk remained in a vertical position until the contents of the tanks had been consumed.

Eight men lost their lives which means that no testimony on the part of the Dodge is available concerning her navigation prior to the collision, since the survivor, Tellefsen, was in the watch below from 6:00 p. m. D. S. T. onward and was rescued from the water into which he was hurled or jumped, after an interval of some hours.

The colliding tanker Michael also took fire at once and having pulled away from the Dodge after penetrating her hull some 14½ feet on the port side near the stern, her crew under the leadership of the mate, was organized into a fire fighting effort which successfully functioned so that this ship was ultimately beached and later reached a shipyard for repairs. Three lives were lost on the Michael, including that of Gustafsen, the third mate.

This tragic happening was in the making for only about four minutes as nearly as can be computed and, in light of all the testimony, was inexcusable.

Since strong reliance is placed by the claimant Carras (owner of the Michael) upon the testimony of the captain and pilot of that ship, a word should be said at the outset, of the conditions on board during the first few minutes after the collision.

Those in the wheelhouse at the time were the captain, Amy, the pilot, Lemmon, the third mate, Gustafsen, and the

helmsman Sibley; the first three at once left the pilothouse as the result of the crash, while Sibley remained for a brief time at the wheel.

Fire at once burst out on the Dodge, and the Michael backed out from engagement with her, the engines at that time being in reverse, and the explosion, which at once occurred on the Dodge, started a fire on the Michael. In the confusion of the moment, there was a delay in sounding the general alarm on the latter but that was done after an estimated interval of three or four minutes.

It is said that ultimately Captain Amy went to the bridge, and two witnesses deposed that the pilot climbed in a lifeboat which was not launched. He denies that he did this, and this recital is not intended to be a finding as to that specific subject.

It is not a cause for wonder that the catastrophe unnerved those who, almost without warning, were required to deal with its effects, but these few moments that bordered upon panic cannot be ignored in appraising the testimony now adduced after a lapse of nearly three years, in which the captain and the pilot have had ample opportunity to reflect and rationalize.

Since the case for the Michael is based upon the central theory that the Dodge was at fault in the matter of her navigation, it will be convenient to discuss that aspect of the controversy at the outset, because its demonstration or lack thereof is of immediate consequence concerning the right to limitation.

### The Parties to the Limitation.

*Petitioners:*

The corporate owner of the Dodge, Diesel Tanker A. C. Dodge, Inc., (to be called A. C. Dodge), and the corporate operator thereof (Spentonbush).

*Claimants:*

The owner of the Michael, J. M. Carras, Inc., to be called Carras;

Mrs. Frances E. Elliott, widow of the deceased master of the Dodge;

Palter and Kosinsky retained their status as claimants but offered no testimony at the trial;

The claimants August Guerin and the Estate of Guerin, Tellefsen, Dafnos and Allard withdrew their claims before the testimony was closed.

The Dodge was a total loss and the owner has abandoned the wreck; it was stated that there was no pending freight because delivery of cargo had to be made in order to earn it.

In effect therefore there is no limitation fund in court, which means that the sole possible redress against the Dodge interests may perhaps be that of personal injury claimants, see Tit. 46 U.S. C.A. § 183(b) et seq.

### The Vessels.

Diesel Tanker A. C. Dodge, 250' 6" by 37' 1"; depth 14' 4"; tank capacity 15,800 barrels; h. p. 805; gross tonnage 1,147; net 951.

Tanker Michael, 523' 6" by 68' 1"; depth 39' 1"; tank capacity 140,722 barrels; h. p. 6,000; gross tonnage 10,441; net 6,249.

The waters involved were part of the Delaware River as shown on U. S. Coast & Geodetic Survey Chart No. 294, namely, that reach between the entrance to the Chesapeake & Delaware Canal on the westerly side of the river, on the north, and Liston Point on the south; this means that a portion of the Liston Range, all of the Baker Range, and all of the Reedy Island Range constituted the waters involved.

The channel in those ranges was 800 feet wide except at the southerly end of Reedy Island Range where it merges into Baker Range; here the width is said to have been about 1200 feet in the vicinity of Quick Flashing Light and Bell Buoy "2R", and the navigation of both vessels was confined to the channel according to the credible evidence.

The tide was flood, of a strength of 1½ knots, and there was a light southeast wind; visibility was good, although

earlier in the evening there had been showers, and seemingly there was no moonlight to illuminate these waters.

The Michael was proceeding up the river with the tide, and the Dodge in the opposite direction, and range and running lights were showing.

The mutual approach of these vessels was oblique, as will be seen from the chart.

### The Compass Courses.

The true compass course from south to north in the various ranges are as follows:

| | |
|---|---|
| Liston Range | 317°. |
| Baker Range | 355° |
| Reedy Island Range | 15°. |

which means that the northbound vessel would make about a twenty degree right turn moving from Baker Range into Reedy Island Range.

The lengths of the ranges are stated, without contradiction, to have been:

| | N.M. |
|---|---|
| Liston Range | 12.4 |
| Baker Range | 1.65 |
| Reedy Island Range | 4.26. |

The total of the last two is 5.91.

The vessels' respective speeds over the ground were about:

| | |
|---|---|
| Michael | 15 knots, |
| Dodge | 9 knots. |

This means the combined speeds were 24 knots or about 800 yards per minute. Since the distance from the northerly end of Reedy Island Range to the southerly end of Baker was roughly 6 nautical miles, a place of meeting would be reached in near enough to four minutes to indicate the approximate time in which these vessels could have arranged for safe passage port to port in an 800 foot channel.

The foregoing is not contested, and requires no findings.

### The Michael's Theory Concerning the Navigation of the Dodge.

It is urged for the colliding vessel that the navigation of the Dodge was faulty in that she veered from her own starboard side of the channel across nearly to the easterly edge, with the probable intention of proceeding on that side of the Reedy Island Range east of buoy 2–R on a shortcut which would save about ten minutes in time and bring her into the Liston Range in the vicinity of buoy 8–L; that course would have opened to the Michael the starboard running light of the Dodge, and thus a probable starboard passing with the Michael.

In conformity with this theory Lemmon testified that the Dodge sank at a place just north of buoy 2–R and to the east of the easterly channel line of the Reedy Island Range.

That testimony is not accepted in the belief that "that wish is father to the thought" for the following reasons:

As has been stated, the immediate effect of the collision and the explosion with accompanying flames and smoke on the Dodge was to create such consternation in the wheelhouse of the Michael as to render it extremely unlikely that any accurate observations were made as to the place where the Dodge sank at the stern within a very few minutes, estimated at three or four, since the fire, first on the Dodge and immediately upon the Michael, was so devastating that mental reactions as related at the end of nearly three years, cannot now be relied upon; it is no reflection on Lemmon to say that he was more concerned with his own safety than with trying to spot the place of the collision. Captain Amy does not attempt to do so, and his testimony may be quoted:

"Q. Where did the collision occur? A. It was in the vicinity of 2–R. I didn't watch the buoy too closely as I was watching the vessel rather than the buoy.

"Q. When you say in the vicinity of 2–R; what do you mean by

that? Within a half mile of it? A. It could have been above or it could have been below a quarter of a mile either way."

It is to be remembered that 2–R is a flashing red buoy.

It is a reasonable inference from the testimony of the pilot Marshall of the downbound Socony (later to be mentioned) that her overtaking and passing of the Dodge, which was accomplished just above the northerly end of Reedy Island Range placed the downbound Dodge in her own starboard side of the channel; the respective speeds of these vessels were 10.8 of the Socony, and about 9 of the Dodge.

Pilot Marshall also of the Socony testified as to these speeds:

"A. I was about two knots faster than she was. It took me 15 minutes to get by her, so about two knots. Her speed would be nine."

The foregoing is thought to mean that while the Dodge was at the northerly end of Reedy Island Range she was on the proper side of the channel, and incidentally it may be that the presence of the Socony while so passing in those waters, is what caused Lemmon to say at the trial that when the Michael was on the Liston Range he saw a (downbound) vessel and he wasn't sure that it was the Dodge; thus:

"There were two vessels—if you want to go into that, sir—

"The Court: Was there any vessel between the Michael and the Dodge?

"The Witness: There was, yes, sir. That is the reason I say, when I mark that the Dodge, I did not know at the time that it was the Dodge. I just saw the range lights and side lights of a vessel."

On the assumption that the testimony of Marshall puts the Dodge in her own side of the channel within four minutes prior to the collision, no reason has been shown why she should have very quickly altered her course so as to head for the easterly edge; this must be so because the first signal blown by the Michael to the Dodge was one-blast for a port passing; this means that at the time of that signal there was no eastward heading observable on the part of the Dodge.

According to Lemmon, a minute to a minute and a half elapsed before the Michael blew a two-blast signal for a starboard passing, and during that interval she advanced from 500 to 750 yards, and the Dodge from 300 to 450 yards.

It is important to realize the significance of that one-blast signal from the Michael and her failure to make any other signal for a minute and a half; it points to a then understanding on the part of the navigator of the Michael that the Dodge was not only in her own waters, but any turning therefrom was not to be anticipated; nor was Pilot Lemmon (whose familiarity with the river and the practices of the vessels navigating upon it must be presumed), who announced any change in the heading of the Dodge. It was the captain, Amy, who was a stranger to the Delaware River; he cried out that the Dodge was going left, and in obedience to that ejaculation the Michael executed a left rudder and blew two blasts, at Lemmon's order. In other words, the Michael was navigated in response to the captain's erroneous judgment as to the apparent course of the Dodge.

The foregoing is based upon the versions of both Amy and Lemmon, and also upon the clear and convincing narrative of the helmsman, Sibley.

As Lemmon's testimony was given on the witness stand, it appeared to me that he was entirely uncertain and unconvincing on the subject of whether he ever anticipated that the Dodge would take the short cut used by light draft vessels, since obviously he could not even estimate her draft by observing her lights.

The unsoundness of Lemmon's theory as to the possible intention of the Dodge —even if he indeed attributed it to her, which I doubt—is exposed by an examination of the chart which clearly indicates that the cut-off route would have

been initiated at buoy 4–B and not above 2–R, because the waters just east of the latter are shallow, the indicated depth being 13 feet which was the draft of the Dodge; even on a flood tide it is not to be supposed that she would have risked following the course that Lemmon now says she could have intended.

Lemmon admitted that if he had known that the Dodge had in fact answered his first one-blast signal with one blast of her own whistle, he would not have navigated as he did. This means I think that he would not have ordered the left rudder and blown the two-blast signal; or stated otherwise, he would not have attributed to the Dodge a swing to the east side of the channel.

It is assumed that Amy and Lemmon in the order named, did observe the green light of the Dodge for a brief interval, for the vessels were within a point or two of being in line; this means that there could have been a brief easing of the Dodge's helm which was promptly corrected; also the course of the Michael in preparing to round into Reedy Island Range could have been responsible for a shifting in her own post of observation. This is another way of saying that the differences in what was seen by Amy and Lemmon on the one hand and Sibley and Fields on the other, could be accounted for by differences in time and in the position of the Michael in the short interval that elapsed between the signals blown by the Michael, during which the several observations were made.

It is urged for the petitioners that Lemmon must be wrong as to the place of the collision, because the sunken position of the Dodge was at the westerly edge of the channel. That is a circumstance which has its place, but standing alone would not suffice to disprove testimony, because the angle of the collision would impel the disabled Dodge in that direction. The blow was inflicted by a ship of 10,441 gross tonnage that was moving at the rate of 10 knots, and the momentum of the impact must have been of great magnitude.

For the reasons stated, it has become apparent to this court that the testimony of Lemmon and Amy is unconvincing to the effect that the Dodge departed from her expectable course after the one-blast signal blown by the Michael; consequently that the navigation of the Dodge is not shown to have been at fault.

*Finding No. 1:* The Dodge did not navigate in the easterly side of the channel while proceeding down river in the Reedy Island Range of the Delaware River, on May 25, 1952; nor is her navigation shown to have been at fault prior to the time that she was struck by the Michael.

#### Signals.

That the Michael, being on Baker Range and somewhere between buoys 4–B and 2–R, blew one blast to the Dodge for a port passing, is attested by so many witnesses as to require acceptance without discussion.

Whether the Dodge answered with one is in dispute; Amy and Lemmon say that they heard no acceptance. They were in the pilothouse which was enclosed, as will be observed by examining Claimant's Exhibits C, D and E, but whether the doors at either side and the ports were open during the critical times is not clearly shown by the testimony.

In addition to Lemmon and Amy, the following witnesses testified concerning the whistle signals of both vessels:

Baker, a local resident,
Idzahl, master of the Socony, and
Marshall, pilot of the Socony,
 for the claimant.
Sibley, helmsman on the Michael,
Fields, lookout on the Michael, and
Kilbride, second mate on the Michael,
 for the petitioner.

Baker says that he heard one whistle and then two whistles and then one whistle, and that the third signal was a long whistle that wouldn't quit and that the explosion seemed to come while that was blowing.

Idzahl (Socony) said that being about a mile below the Michael after having passed that vessel to port, there was a one whistle blast, then shortly a two whistle blast, and then there was another short one "but the two first ones came from the T-2 tanker and I am familiar with the T-2 tanker when I hear one, but the third one was a different sound again." This testimony does not indicate a one-blast signal given by the Michael following two blasts, which both her pilot and captain describe; therefore in this respect is not complete as to the signals blown by the Michael.

Marshall says that after passing the Michael and when she was just astern of the Socony, the Michael "sounded one blast of the whistle. * * * after one blast by the Michael I cannot say how long elapsed, but it was a good interval, and the Michael sounded two blasts. Immediately following the two blasts I heard one short toot from an air horn the type of the A. C. Dodge who I had just blown in to, and heard her answer. It could only be the Dodge. There were only three of us in the vicinity. Immediately following that, there was one long blast from a whistle the type of the Michael." A comment made by the witness to the third mate was stricken.

The sequence of signals as so related is not in accordance with the testimony of either Lemmon, Amy or Baker, and is significant in that it attributes a one-blast signal to the Dodge after the two blasts from the Michael.

Sibley was the helmsman from about 9:40 p. m. and his testimony is clear that at a time when these vessels were approaching from opposite directions, the Michael sounded the first signal, namely a one blast; that the next signal was a one blast from the Dodge, and thereafter the Michael sounded two blasts, which were shortly followed by one blast from the Michael, after which he heard no other signals.

Fields was the lookout stationed on the bow of the Michael (five years experience at sea, four of which were in the Navy).

He first sighted the Dodge "coming around the bend, on the starboard side * * * about a point or a point and a half on the starboard side of the channel." He was posted as lookout about 10:20 p. m. and two or three minutes later he observed the Dodge, namely her range and red running lights. He was just going to walk back and report the vessel when the Michael blew a one-whistle signal and he heard an answering one whistle from the Dodge; "* * * after that the Michael sounded a two-blast signal and then she sounded a one-blast signal." He said that the Dodge was showing a red light at the time of the interchange of one-blast signals and that when the Michael sounded her two blasts the Dodge was still showing her red light and as nearly as he could remember the same was true when the Michael blew the one-whistle signal following the two.

Kilbride, the second mate, was below, and heard the Michael blow one whistle and another vessel answer it and a little later the Michael blew two whistles and "the other vessel did not answer. A little while after, the Michael blew one whistle and just a little while afterwards the crash."

The testimony of these three witnesses has been weighed in the light of a possible bias on the part of Sibley and Kilbride based upon interchanges between them and Captain Amy during the course of this voyage of the Michael from the Persian Gulf.

So far as Kilbride is concerned, his testimony is not deemed to be controlling since both portholes in his cabin were closed at the time that he heard these signals, but for what it is worth I am satisfied from observing him on the witness stand, that such differences as occurred between him and Captain Amy did not cause him to testify falsely in court.

As to Sibley, his deposition as a whole creates the impression that he was an intelligent and quite articulate witness; he owned to differences and inter-

changes with the captain due to the fact that he was the union representative on the ship; however the narrative in his deposition was substantially the same as that that he gave at the Coast Guard hearing a few days after the collision; since he and the lookout, against whom no prejudice seems to be urged, agree to the fact that the Dodge gave an answering signal accepting the original one blast for a port passing blown by the Michael, the testimony to that effect is accepted by this court.

 Not so many years ago it was customary in the admiralty to make allowances for an understandable and somewhat reassuring bias on the part of seamen in favor of their own ship. It is possible that marine union activities have led to a departure from that attitude of an earlier day, but with what impact upon the ultimate cause of truth and veracity may not be entirely certain. The margin of persuasion lies with the Dodge as to the acceptance of the one-whistle signal blown by the Michael, and findings concerning the whistle signals of both vessels follow.

*Finding No. 2:* While the Michael was on Baker Range and between buoys 4–B and 2–R, she blew a one-whistle signal to the Dodge for a port passing:

*Finding No. 3:* The Dodge answered that with a one blast acceptance while the vessels were yet far enough apart to safely effect such passing.

*Finding No. 4:* After an interval of about one and one-half minutes, the Michael blew a two-blast signal (without having reduced her speed), for a starboard passing.

*Finding No. 5:* The Dodge did not answer that signal, nor did she blow a danger signal.

*Finding No. 6:* Within about one minute or slightly less, the Michael blew a one-blast signal for a port passing, and in less than a minute the Michael ran down the Dodge and sank her.

*Finding No. 7:* The Michael did not blow a danger signal at any time.

*Finding No. 8:* The Michael at almost the instant of striking the Dodge, put her engines in reverse, but did not blow a three-whistle signal so to indicate.

Helm Movements of the Michael.

These must be understood in light of the indicated compass courses on the successive ranges heretofore listed. If the first sight of the Dodge on the part of the Michael prior to the latter's one-blast signal, actually occurred, as seems to have been the fact, while the Michael was yet on the Liston Range, the Dodge would have appeared as much as three to four points on the starboard bow of the Michael; then as the latter turned from a true compass heading of 317 on the Liston Range to 345 instead of 355 on the Baker Range, the Dodge would seem to be more nearly ahead, namely from a point to a point and a half on the Michael's starboard bow. As the latter proceeded up the 1.65 nautical miles of the Baker Range and was about to enter Reedy Island Range, her true compass course would change to 15—a matter of 20 degrees, and it would be important to know exactly how that change was made:

Lemmon says that leaving the Liston Range and entering Baker, the course was 345 to accommodate a possible southbound vessel using the cut-off above referred to, although there was no such vessel in sight at that time; this means that the Michael swung somewhat wide in entering the Baker Range, but whether wide enough to see the starboard light of the Dodge does not appear, although as the Michael continued (passing the Socony) the course was changed to 359 at slightly above buoy 4–B, which is about 1,600 yards southerly from buoy 2–R, and that was the position of the Michael when she blew her one-blast signal to the Dodge which Lemmon estimated to be distant about one and one-half miles.

The next change of helm was for a ten-degree right rudder to round buoy 2–R; Sibley reported his helm at 009 and was told to continue swinging and

steady at 015, being the Reedy Island compass course, and it was at that time that Lemmon said that the Dodge abruptly turned closing out her red sidelight and showing the green light, which he then placed at a point or a point and a half on the Michael's starboard bow.

It will be seen that the accuracy of that observation would depend on whether the Michael was swinging wide around 2–R or not, because if when she was proceeding up Baker Range her heading was not 355 according to the compass course, but 345 at the outset and later changed to 355, she *could* have been sufficiently to the west to see the starboard light of the Dodge even though the latter had made no change in her own heading. This however is so much a matter of conjecture that no finding can be based upon it.

Whatever the precise position of the Dodge was thought to be when Captain Amy reported that she was going left, the fact is that Lemmon ordered to helmsman to give a full left wheel and blew two blasts to the Dodge. This was done after an interval from the first blast which Lemmon estimates to have been from a minute to a minute and a half.

There was no answer from the Dodge to the two-blast signal, and Lemmon says that at the time he was below buoy 2–R, not quite up to it.

▆ It is impossible to understand why at this juncture neither vessel blew a danger signal, but such is the fact, and the fault was mutual and glaring. Since this decision proceeds upon the theory that the Dodge had accepted the original one-blast signal from the Michael, it was her duty to stop and sound the danger signal immediately after the two-blast signal from the Michael, and that her failure to do so must be deemed to have contributed to the catastrophe, admits of no doubt.

The Michael's hard left rudder above referred to was ordered while the ten degree right rudder swing was still effective, which means that the Michael did not at once swing to her left, but during that movement Lemmon said "the Dodge again opened up his mast headlight and range light, closed out his green light, and showed me his broad red * * * about one point on my starboard bow * * * I immediately gave the order to right full rudder, sounded one blast of the whistle, and Captain Amy almost immediately at the same time rang the engine full speed astern by the telegraph."

Incidentally, no bridge bell book has been produced.

Lemmon estimates the interval between the two-blast and the second one-blast blown by the Michael as about one minute. Lemmon says that the ships were then about a thousand feet apart; since the engine movement full speed astern did not take effect at once, the Michael was making about ten knots through the water when she struck the Dodge, so that the collision occurred within much less than one minute from the second one-blast signal, because the vessels were approaching at a combined speed of over 600 yards a minute.

The interval between the Michael's two-blast signal and her second one-blast is estimated by Lemmon, as above stated, as about one minute. During which she moved in response to the left, then hard left rudder, but how far no one undertakes to say. Since the channel was about 1,200 feet wide at buoy 2–R and the Michael was about 500 feet long, she would have to proceed less than three lengths to be well into the Dodge's side of the channel before the helm was again changed to hard right. Sibley says that the ship was still moving left at the time of impact, which would explain the 45 degree angle of collision.

▆ Thus it will be seen that the helm movements of the Michael were calculated to cause her to strike the Dodge in the latter's own side of the channel which is where the collision occurred as nearly as can be made out from the testimony, rather than at the place indicated on the chart by Lemmon; and it is so found.

*Finding No. 9:* The Michael struck the Dodge while the latter was in the westerly half of the channel at about where Reedy Island Range converges with Baker Range, or slightly to the north.

### Navigation of the Michael.

█ The outstanding aspect of the navigation of the Michael is that at no time while this collision was in the making did she arrest her speed, which was from 15 to 15½ knots over the ground, until the order to reverse engines was given above referred to; this means that while she professes to have been in doubt as to the course of the Dodge at the end of a minute and a half after her one-blast signal—which leaves 2½ minutes yet to elapse—she did not slacken her speed, which was the plain requirement as the evidence is presently understood.

From the time that she blew her two-blast signal, knowledge is necessarily attributed to her that a condition of peril was in the making if it had not already arisen, and the plainest requirement of caution was to reduce her speed at least to mere steerageway, and no testimony offered for her can be deemed to exculpate her for that fault.

Assuming that the hard left helm and the two-blast signal were about simultaneous, there was a remaining interval in which she was required to blow an alarm, namely,

"Rule III. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle." 33 U.S.C.A. § 203.

That the Michael failed to understand the course and heading of the Dodge is clear from the testimony of both Lemmon and Amy, and why the doubt was not signified on the whistle is one of the mysteries of the cause.

Not only should the Michael have blown a danger signal but she should have promptly cut down her speed to steerageway, and the failure to do so between her two-blast signal and her final one-blast must be deemed to have played a major part in the collision.

The Michael's ex-parte exposition concerning the navigation of the Dodge is held to have failed to persuade. The navigation of the Dodge has not been discredited and her own failure to blow the danger signal had nothing to do with her position in her own side of the channel.

*Finding No. 10:* The Michael was grievously at fault: (a) For not reducing her speed at the time of blowing her two-blast signal and stopping if need be, to avoid the peril of collision; (b) For not blowing a danger signal and stopping her engines when she received no answer from her two-blast signal to the Dodge; (c) For not blowing a three-blast signal when she reversed her engines just prior to running down the Dodge. This was a fault, although probably played no part in the collision.

### The Manning of the Dodge.

The claimants seek to defeat limitation by arguing that the Dodge was undermanned, with the result that those in charge of her navigation must have been suffering from fatigue. This argument might have weight if the evidence demonstrated faulty navigation on the part of the Dodge, but as has been seen such is not the effect of the testimony. Therefore the argument reduced to lowest terms means that the undermanning, if it existed, automatically deprived the Dodge of the right to limit, in spite of the fact that she was run down and sunk by the Michael, whose eccentric navigation is deemed by this court to have been the predominant cause of the disaster.

The Dodge was bound to Baltimore, Maryland, on a trip from Eagle Point, New Jersey, departure having been had at about 6:45 p. m., and the ship's company consisted of the following:

John D. Elliott, Captain;

John W. Elliott, Second Mate (son of the captain);

Charles Hoie, Chief Engineer;

John R. Holmes, First Assistant Engineer;

Raymond E. Anderson, Rasmus S. Kleppe, Howard E. Moller, Sjur Tellefsen, Deckhands;

William O'Brien, Cook.

The First Mate and others of the crew were not on board, presumably because they were taking their ten days ashore out of every thirty days' employment by the ship.

Petitioner's Exhibit 6 is the certificate issued by the Coast Guard, stating the requirements of the number of men to be carried, namely, one master, one chief mate, one second mate, one third mate, four able seamen, two ordinary seamen, one chief engineer, one first assistant engineer, one second assistant engineer, one third assistant engineer and one certificated lifeboat man. There is a typewritten rider attached to the certificate containing a modification, namely,

"When navigating on Bays, Sounds and Rivers, one first class pilot is required in lieu of three mates and the second assistant and third assistant engineers may be dispensed with. When navigating on Bays, Sounds and Rivers, and if the hours of duty do not exceed 12 of any 24, the following licensed officers and crew are required: One master and pilot, two able seamen, one o. seaman, one chief engineer. When navigating on a Harbor or River route exclusively, deckhands may be carried in lieu of able seamen and the lifeboat man may be dispensed with."

The trip between the points named was a customary run for the Dodge at this time, and was usually accomplished via the Chesapeake & Delaware Canal, the river entrance to which will be found on the chart in evidence, whereby the vessel restricted herself to inland waters, namely, bays, sounds and rivers.

On this occasion, however, by reason of the presence of a wreck in the canal, it became necessary to complete the southbound voyage by proceeding down the Delaware River to its mouth, thence in the ocean to Newport News. Therefore it is argued that the quoted restriction from the certificate should not be held to apply to this voyage (although the collision occurred in the river before the voyage was completed), and the Dodge must be deemed to have been undermanned because part of the voyage would be coastwise.

That is the view which the Coast Guard took in a proceeding arising out of its investigation into the collision; the result was a fine levied upon the owner of the Dodge as for a violation of the controlling statute, Tit. 46 U.S.C.A. §§ 222, 223, also 235, namely the operation of the Dodge on a coastwise voyage without the required crew complement, the deficiency being one chief mate, one second assistant engineer and one ordinary seaman.

A prior fine had been levied in December, 1951 against the owner for a similar violation involved in a voyage which was also partly at sea, testimony concerning which was received, not because it tended to prove anything concerning the issues in this cause, but because it constituted specific notice to the owner of the Dodge that a similar deficiency (one chief mate, one assistant engineer, one able seaman and one ordinary seaman) was deemed to constitute a violation of the applicable statute.

The legal effect of the said 1952 holding by the Coast Guard is that there was an administrative finding of a violation of law and regulations promulgated in the public interest; of course that finding does not purport to touch the question of the navigation of the Dodge on this occasion. The subject is referred to only that the record may be complete.

It is assumed but not decided, that the Dodge was undermanned for the purpose of a coastwise voyage which had been begun when she left Eagle Point to the

knowledge of her owner and operator (Spentonbush).

Much of the discussion in the briefs filed by the claimants has to do with this aspect of the case, and rests upon the proposition that Captain Elliott, who had to act as pilot since his son did not hold a pilot's license for the Delaware River, must have been an overtired and fatigued man. From the nature of the case it will be seen that this is purely argumentative, not evidentiary. Captain Elliott had returned to the Dodge but four days before the voyage in question, having taken his ten days' time ashore under a custom prevailing on the ship, which was with the knowledge and acquiescence of the owner:

On May 25th he had been on watch from 6:00 a. m. until 12:00 o'clock noon, and probably during her docking at Eagle Point, which occurred at 2:10 p. m.; his watch began at 6:00 p. m., and it is assumed that he was navigating his ship from that time until the collision, since he did not carry a licensed Delaware River pilot; nothing however can be assumed concerning his physical condition with respect to fatigue or otherwise.

The authorities relied upon by the claimants, namely, The Denali, 9 Cir., 105 F.2d 413; The N. Y. Marine #10, 2 Cir., 109 F.2d 564; Moran Towing & Transp. Co. v. United States, 80 F.Supp. 623; and South Carolina State Highway Dept. v. United States, D.C., 78 F.Supp. 598, all involve fault and mishandling by the undermanned vessel, as the result of which limitation was denied upon the theory that there was a direct or causal relationship between that undermanning and the faulty navigation which caused the misadventure present in each cause.

There has been no such demonstration here.

These circumstances are even more favorable from the standpoint of the Dodge than those present in United States v. Wessel, Duval, etc., D.C., 123 F.Supp. 318, at page 337, a Southern District case in which Judge Ryan observed:

"I find that the violation by Wessel Duval of the statutory requirement that there be three licensed mates aboard in no way contributed to the stranding of the Edward Rutledge on the morning of April 15. It is apparent that observance of the statute by the presence of a third mate aboard would not have averted the disaster; in such case 'the non-observance of such rule becomes immaterial.' The Umbria, 166 U.S. 404, 17 S.Ct. 610, 616, 41 L.Ed. 1053, 1061."

In this case, the undermanning was indeed fortuitous, for if the full complement had been carried on the Dodge, there would have been two watches below instead of one, with a probable increase in casualties by that margin.

*Finding No. 11:* There was no causal relation between undermanning which is assumed to have existed on the Dodge, and her navigation immediately prior to and at the collision.

### Privity.

For the sake of completeness, it should be stated that the record presents no problem on this subject. The legal title to the Dodge was vested in the corporation first named as a petitioner and she was operated by Spentonbush, etc., also a petitioner; both of them were wholly owned subsidiaries of the parent Bushey Company, Ira S. Bushey & Sons, Inc., and the intercorporate relations, including for the most part identity of officers and directors, were such that knowledge of all operating, manning and other data affecting the navigation and conduct of the Dodge are to be attributed to the petitioners, and if need be, to their corporate owner.

The wreck in the Delaware & Chesapeake Canal to which reference has been made was that of a Bushey vessel; consequently the necessity on the part of the Dodge to use the route to Baltimore involving some miles at sea had been

known to the petitioners for about ten days prior to this disaster. This means that the manning requirements which have been discussed, must be deemed to have been reckoned with by the petitioners.

 The testimony of Captain Rossiter, the port captain employed by Diesel Vessel Operators, Inc., another Bushey subsidiary, and that of Mr. Francis B. Bushey, vice-president of the first named petitioner, leaves the court in no doubt on this general subject, so that if the last finding above made shall be held to be clearly erroneous, the way is open to correction without the necessity for a new trial.

*Finding No. 12:* The deficiency in the manning of the Dodge which has been assumed was with the privity of her owner.

### Conclusions of Law.

1. The court has jurisdiction of the parties to this proceeding and the subject matter.

2. The striking of the tanker Dodge by the tanker Michael on May 25, 1952 at about 10:30 p. m. D. S. T. in that part of the Delaware River which includes Baker Range and Reedy Island Range was the result of faulty navigation on the part of the Michael in respect of the matters concerning which the foregoing findings of fact have been made.

3. The navigation of the Dodge from the time that she accepted the Michael's first one-blast signal has not been shown to have been at fault.

4. The Dodge was at fault for having failed to blow a danger signal immediately upon the sounding of the two-blast signal by the Michael, and that fault contributed to the disaster.

5. The undermanning of the Dodge, which has been assumed, had no causal relation to the striking of the Dodge by the Michael.

6. Both vessels were at fault, and this is therefore a both to blame case.

7. The petitioners are entitled to the benefit of limitation in this proceeding.

Settle decree in the usual form, providing for the appointment of a commissioner.