Petition of OSKAR TIEDEMANN AND COMPANY for exoneration from or limitation of liability, as owners of THE SS ELNA II.

Petition of the UNITED STATES of America and Mathiasen's Tanker Industries, Inc., for exoneration from or limitation of liability as owners of THE USNS MISSION SAN FRANCISCO.

Nos. 1764, 1765.

United States District Court
D. Delaware.

Nov. 13, 1959.

Ernest S. Wilson, Jr., of Morford, Young & Conaway, Wilmington, Del.; Thomas E. Byrne, Jr., and John W. Ennis, of Krusen, Evans & Shaw, Phila-

delphia, Pa.; Perry A. Beck, New York City, for petitioner Oskar Tiedemann and Co.

Leonard G. Hagner, U. S. Atty., Robert W. Wakefield, Asst. U. S. Atty., Wilmington, Del., Harold G. Wilson and William C. Baker, Washington, D. C., for petitioner United States.

Harold Leshem and Harvey B. Rubenstein, Wilmington, Del., Abraham E. Freedman and Marvin I. Barish, of Freedman, Landy & Lorry, Philadelphia, Pa., for various claimants.

Wilfred J. Smith, Jr., and Frank J. Gentile, Jr., Wilmington, Del., John D. Richardson, Houston, Texas, for Ruth Allen, claimant.

William H. Foulk, Wilmington, Del., and Benjamin F. Stahl, Jr., Philadelphia, Pa., for Captain Henri V. Rice.

Henry A. Wise, Jr., Wilmington, Del., and Marvin Schwartz, New York City, for claimant Healy.

Herbert L. Cobin, Wilmington, Del., for various claimants.

LAYTON, District Judge.

On March 7, 1957, about 12:20 in the morning, the USNS "Mission San Francisco" (Mission), northbound, and the S.S. "Elna II" (Elna), southbound, collided in the close proximity of Buoy 1D on the Deepwater Range of the Delaware River about two miles south of New Castle. The collision was followed by two shattering explosions aboard Mission as the result of which her midship housing collapsed and sank into her hull, she broke in two and sank very swiftly. There were a number of deaths and injuries among Mission's crew.

Mission is an undocumented tanker owned by the United States (Military Sea Transport Service), manned by a civilian crew of 44, and operated by the Mathiasen's Tanker Industries, Inc. She had discharged a cargo of aircraft turbine and jet fuel (grade "JP–4") at Newark, N. J., the day before and was returning to Paulsboro, N. J., to take on a new cargo.

Elna is an old cargo ship operated under the Liberian flag. She had discharged a cargo of wood pulp at Wilmington and about 11:30 P.M., March 6th, left the Marine Terminal and proceeded down river for Baltimore under the command of Captain Kaare, an Estonian, residing in Toronto, Canada.

The United States, Mathiasen's Tanker Industries, Inc., and Oskar Tiedemann & Company have each petitioned for exoneration or limitation of liability pursuant to Sections 181–189, 46 U.S.C.A.

The vicinity of the collision is a sweeping bend in the Delaware River around what is familiarly known as Goose Point on the Jersey side. A northbound vessel navigating the bend leaves New Castle Range by making a 34 degree turn to starboard (about Buoy 2B) on to Bulkhead Bar Range. Bulkhead Bar Range is short, about 1200 yds. in length, and leads into Deepwater Point Range several hundred yards below Buoy 1D, at which point the vessel must make another 34 degree right turn into Deepwater Point Range. The two turns altogether comprise a sharp turn of 68 degrees. Some vessels navigate the bend in two distinct turns. Particularly at flood tide, as at the time of this accident, many navigators prefer to make the bend in one sweeping turn. At flood tide also, it is much better practice to hug the eastern, or Jersey, side of the channel because of the tendency of the following tide to skid the stern of a vessel sharply as she turns right.

The evidence strongly supports the following findings. The night was very clear with a five mile breeze. Mission was proceeding northbound at at least 17 knots (22 M.P.H. over the ground).[1] The two vessels had, or could have had, each other under observation for 15 or 20 minutes prior to the accident. Indeed, Elna saw Mission's mast lights across Goose Point when the vessels were perhaps 4 miles apart. After making her turn into Bulkhead Bar Range, Mission proceeded straight up, or slightly to the

---

1. There was a 2 knot tide behind her.

right of, the center of the channel, and never again substantially changed her course. While a mile apart, Elna blew one blast indicating a port to port passing. Mission failed to respond. Parenthetically, it may be noted here that Mission's bridge twice failed to acknowledge her own bow watch's warnings (one bell) of Elna's approach.

When about one-half mile apart, and at a point where an extremely dangerous situation had developed, Elna again blew one blast which Mission ignored. Almost immediately thereafter, when collision was inevitable, Elna reversed her engines but could not avoid striking the starboard side of Mission which continued across Elna's bow.

The two heavy explosions aboard Mission which followed the collision blew huge gaps in her hull and the mid-ship housing collapsed into the hull. Despite these crippling blows, she was carried on by her own momentum and the tide some distance until she finally sank at a spot about 1380 feet north and east of Buoy 1D. The conclusion can only be that there was something terribly wrong on the bridge of the Mission that night; just what will never be known, for all her navigating officers including the pilot were killed in the explosion. As earlier observed, both ships have filed petitions for complete exoneration from liability. I shall first dispose of the petition of the Mission. Enough has already been determined by the general findings of fact to support a summary denial of this petition, but, even at the cost of some repetition, the importance of the case justifies a closer review.

### Mission's Petition for Exoneration [2]

It is, of course, elementary that any negligence on the part of a vessel resulting from imprudent conduct in her navigation generally or from the violation of a statute will defeat a petition for exoneration from liability if such negligence was a contributing cause to the accident. United States v. Woodbury, 1 Cir., 175 F.2d 854; The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; The Law of Admiralty, Gilmore & Black, Chap. VII, pp. 420–422. Here we find the Mission about 10:30 P.M. on the same night, steaming at full speed at Cross Ledge Light heedless of the presence of other vessels, ignoring whistles required by law and practically crowding the S.S. Gulf Lube onto the shoals on her extreme right side of the channel.[3] Next, immediately prior to the accident in suit, we see her approaching a dangerous bend without diminishing her high speed, holding much too close to the center of the fairway rather than hugging her right, or easterly, side in conformity with safe practice, twice ignoring warning bells from her own bow lookout advising of the near approach of Elna, twice ignoring Elna's one blast signals for a port to port passing and, finally, crowding far over into the wrong side of the channel with the result that she collided with Elna which was well on her own side of the channel. In the course of so doing, Mission clearly violated two statutory rules of the road. First, she was in violation of Article 25 (33 U.S.C.A. § 210) of the Inland Rules which provides:

> "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

Secondly, she just as clearly violated Article 18, Rule 1 (33 U.S.C.A. § 203) in failing to acknowledge the one-blast signals of Elna. Rule 1 reads:

> "When steam vessels are approaching each other head and head,

2. When referring to the Mission's petition, I include also the petition of Mathiasen.

3. This incident was admitted into evidence primarily because it had a direct bearing on the competence of the Mission's pilot and secondarily because it might have some slight relevance to the circumstances of the collision itself. Actually, it is cited here more as picturing the chronological sequence of events rather than direct evidence of negligence. The Mission's clear violation of two statutory rules of the road is the basis for my finding her negligent.

that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other."

Now, under such circumstances the so-called Pennsylvania rule (The Pennsylvania, above cited) becomes squarely applicable. There the Supreme Court held that the violation of a statute (using a bell instead of a foghorn as required by statute) placed the burden upon the violator to show, not so much that the violation did not contribute to the accident, but rather, that it could not have. In this connection, the Court said at pages 136, 137 of 19 Wall., at pages 136, 137 of 86 U.S.:

> "Concluding then, as we must, that the bark was in fault, it still remains to inquire whether the fault contributed to the collision, whether in any degree it was the cause of the vessels coming into a dangerous position. It must be conceded that if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration. The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

\* \* \* \* \*

> "Who can say the proximity of the vessels would not have been discovered sooner if the bark had obeyed the navy regulations? If it be said this is speculation, it may be admitted, but it is speculation rendered necessary by a certain fault of the bark. It is equally speculative to conclude that the collision would have taken place if a foghorn had been used instead of a bell, and infer therefrom that the fault of the bark had no relation to the disaster. The truth is the case is one in which, while the presumption is that the failure to blow a foghorn was a contributory cause of the collision, and while the burden of showing that it was in no degree occasioned by that failure rests upon the bark, it is impossible to rebut the presumption. It is a well-known fact that in some states of the atmosphere a foghorn can be heard at much greater distances than in others. How far it could have been heard when this collision occurred can never be known. Nor can it be known what precautions the steamer would have adopted if the true and proper signal had been given her. Hence, it appears to us the bark has not proved that her failure to obey the shipping regulations was not a concurrent cause of the injury she received; and, consequently, as both vessels were in fault, the damages, according to the admiralty rule, should be divided."

Here, Mission's flagrant violations of the cited Rules of Navigation so obviously contributed to this tragedy that further discussion is useless. The Mission was guilty of gross negligence contributing directly to the result, and her petition and that of Mathiasen for exoneration are denied.

### Elna's Petition for Exoneration

As in the case of the Mission, any negligence involving imprudent seamanship generally, or in violation of a stat-

ute, would defeat Elna's petition for exoneration if the negligence contributed to the accident. It is my conclusion that she was partially to blame for the collision. Mission's negligence was gross. Elna's was very much less but sufficiently substantial to justify a denial of her petition because, in my judgment, with the exercise of the kind of prudence and good judgment demanded by the Rules of the Sea, she might have avoided the collision despite the extraordinarily careless seamanship exhibited by Mission. Elna had Mission under observation fifteen minutes before this collision. The accident occurred in a narrow and dangerous channel. Elna knew this. She knew also, or should have known, that Mission was large, coming up very fast [4] and holding to the center of the channel rather than hugging the starboard, or easterly, side as good seamanship demanded at this point. This meant that being relatively in the center, and with a starboard turn of approximately 34 degrees facing her, Mission had to start her right turn relatively far down Bulkhead Bar Range in order to keep on her own side of the channel as she entered Deepwater Range. When the ships were about one mile away, Elna blew one blast indicating the traditional port to port passing. Now, a mile may seem like a considerable distance to a landsman accustomed to navigating in automobiles which, while relatively fast, answer immediately to a touch of their wheel, can decelerate fast simply by letting up on the accelerator, and very fast indeed by the application of brakes. But ships are ponderous, unwieldly things which answer their helms, not immediately, but in long seconds and whose only brakes are reversed engines which can stop them, not in a matter of feet, but perhaps in thousands of yards. The combined length of the two ships themselves was 1/7 of a mile. So, under these circumstances, a mile was not a great distance apart for ships approaching each other at a combined speed of 30 miles per hour in a narrow, sharp bend of the river to make known their intentions. As the Elna whistled, her Captain, Pilot and bow watch, all mariners of long experience, noted that Mission did not give an answering blast. This failure raised serious implications. In a very short while Mission had to turn right or else come far over into Elna's side of the channel. Precious time within which collision might have been averted was eaten up while Elna waited for an answering signal. The pilot was worried. The Captain was worried. He said to the Pilot, "What's the matter with that ship?" Capt. Kaare noted that Mission did not turn at the point he would have expected a ship of her size and speed to turn. Meanwhile, Elna had done nothing but make an easy right turn which took her to the far side of the southbound side of the channel.[5]

Now we find ourselves with the ships but one-half mile apart. Their combined lengths alone are one-third of that distance. The Mission has proceeded beyond the point where Captain Kaare thought she should have turned. The combined speed of the vessels would bring them together in approximately one minute. At this critical juncture, Pilot Rice ordered another one-blast signal for a port to port passing. Almost immediately thereafter (perhaps twenty seconds) he ordered full astern but collision was then inevitable for it admittedly would take some time for the Elna to go from full ahead to full astern and less than one minute's grace then remained.

It is almost impossible to have listened closely to the testimony at the trial, in connection with a careful examination of the charts, without coming to the regrettable conclusion that Elna waited too long

---

4. Actually, Pilot Rice stated that in his opinion under the circumstances Mission was coming up too fast.

5. The tragedy of the thing from hindsight is that Elna, traveling light, could easily have turned hard to her right and gone far outside the actual channel for there was plenty of water for several hundred yards to the starboard side of the channel marker, Buoy 1D, within which she could have safely navigated.

before taking any action to avert collision.[6] Rule III, Article 18 (33 U.S.C.A. § 203) of the Inland Rules provides:

"If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, *from any cause*, the vessel *so in doubt* shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle." (My emphasis.)

A number of considerations combine to compel the conclusion that the time to give the rapid blasts demanded by Rule 3 had fully arrived when the Elna was content with giving the second one-blast signal.

(1) Mission had failed to answer Elna's one blast.

(2) Mission had proceeded beyond the point where Capt. Kaare thought she should have made her turn.

(3) Capt. Kaare was worried.[7]

(4) He said to the Pilot, "What's the matter with that ship?"

(5) Martel, the Mission's bow watch, thought collision was inevitable even before Elna's second blast.

(6) The first evasive action (full astern), about twenty seconds after the second blast, was hopelessly late.

(7) If so, then the one-blast signal which immediately preceded the full astern signal must also have been late.

(8) The happening of the accident, although of itself hindsight, when combined with the above considerations, speaks for itself.

In this connection also, Capt. Kaare's actions on the night in question were seriously open to question. He ignored the bow watch by indicating he wanted no warning signals from this source because he could see better from the bridge. He virtually abdicated all control over the vessel in favor of the Pilot.[8] When asked if he could not have avoided the collision by a last minute hard left turn, his answer was "Because if we would have turned to port and the 'Mission' to the right, then it would have been my fault." *In other words, he was holding to his right of way regardless of the consequences.*

To the question why evasive action was not sooner taken, both Captain Kaare and Pilot Rice repeatedly defended by stating that it was too late.[9] But this answer will not do. As the Supreme Court of the United States remarked in The America, 92 U.S. 432, 437, 23 L.Ed. 724:

"Argument to show that nothing could have been done at the moment

6. Hellenic Lines v. The Exmouth, 2 Cir., 253 F.2d 473, seems to be contrary to this conclusion. However, I regard Judge Clark's strong dissent as the more correct view. Compare Petition of Diesel Tanker A. C. Dodge, Inc., D.C.E.D.N.Y., 133 F.Supp. 510, affirmed 2 Cir., 234 F.2d 374, certiorari denied The A. C. Dodge, Inc. v. J. M. Carras, Inc., 352 U.S. 928, 77 S.Ct. 227, 1 L.Ed.2d 163, which seems contrary to the majority view in Hellenic.

7. "Q. And when you did not get a reply [from Mission to Elna's first one blast] didn't you begin to wonder? A. Surely I started to wonder, yes."
"Q. You started to worry didn't you? A. Yes."

8. "Q. In any event that night you were depending entirely upon Pilot Rice for the navigation of your vessel, is that correct? A. Yes."
"Q. Do you mean, sir, that when you were with the Pilot on this particular

night, you were not alert to where you were or where you were going? A. I trusted our pilot that night."
"Q. Captain, when you are in the Delaware waters, the waters of the Delaware River, what navigation laws do you follow? A. I follow the pilot's orders."
"Q. And you blow the 4 blasts when you are uncertain about the other fellow's intentions, isn't that correct? A. That is correct."
"Q. Why didn't you do it here? A. I was waiting for pilot's orders."

9. "Q. From your last answer am I to understand that you went ahead and let the accident happen because you didn't want it to be your fault? A. It was impossible for me to avoid the accident."
"Q. And if you had thrown your anchors overboard, that would have helped retard you and help avoid the collision, would it not? A. No. It was too close,

to avoid the collision is quite unnecessary, as the proposition is self-evident; *but the fault consists in getting the two vessels into that dangerous situation. Precautions in such cases must be seasonable in order to be effectual; and if they are. not so, and the collision ensues in consequence of such delay, it is no defence to allege and prove that nothing more could be done at the moment to prevent it, nor to allege and prove that the necessity for precautionary measures was not perceived until it was too late to render them availing.*" (My emphasis.)

Finally, if any doubt should remain in the mind of anyone that prudent judgment dictated that evasive action, such as a hard right wheel or full astern, or the dropping of anchors (or a combination of all three courses) should sooner have been taken, we have the testimony of First Mate Heinmaa. This man was an experienced seaman, held a Master's license in his own country and had recently commanded ships only slightly smaller than Elna. He was the bow lookout that night and had a full view of the whole affair. At the Coast Guard hearing preceding this trial by two years, when his memory was much fresher than at trial, he testified under oath:

"Q. You realized the *crash was imminent at the time,* second time *you heard the second blast of the whistle?* (My emphasis.) A. *Yes,* it appeared *certain* to me." (My emphasis.)

too close to help. The anchors couldn't help any."
"A. We would have run into her in any case whether we turned to the left or to the right."
"Q. Did you at any time blow 3 or 4 blasts on Elna's whistle that night? A. No, sir."
"Q. What was the reason? A. (Pilot Rice) I didn't have time from the point where the situation ceased to be a normal situation."

10. Thereafter, Heinmaa rather too obviously tried to shift the emphasis of this testimony by saying that Mission could

* * * * *

"A. She [Mission] had the time enough time before the whistle, *between the whistles,* to turn." (My emphasis.)

He reaffirmed this testimony at this trial.

Again, at this trial he testified:

"Q. It was at the time of this second one blast you say that you expected the San Francisco to start turning to the right? A. Yes. I was expecting *already before the second blast she has to start to turn.*" (My emphasis.)

"Q. I see. You were expecting her to start to turn *before* the second blast? (My emphasis.) A. Yes."

"Q. How much before? A. Between the first one blast and the second one blast."

"Q. Well, how much before the second one blast were you expecting her to turn? A. *Soon after the first blast* she should * * *.*" (My emphasis.)

In the light of this positive testimony [10] given on two occasions by an experienced seaman who saw the whole accident unfold before his eyes, it is impossible to conclude otherwise than that the Elna, at the very least, violated Rule 3 of the Inland Rules and, further, that she failed to meet the very heavy resulting burden of proving that regardless of the breach, the accident could not have been avoided. Elna's petition for exoneration must be denied.[11]

have safely turned until after the second whistle. I do not credit this belated attempt to change his former unequivocal testimony.

11. Elna's argument that at a sharp turn a vessel in Mission's position might have time to make a safe last-minute right turn so close to the point of collision that the down-coming vessel would not have time to take evasive action if the Mission actually did not turn is considered and answered in that portion of this opinion dealing with the United States against Pilot Rice.

Having concluded that neither the government nor Elna is entitled to complete exoneration, there remains the question as to whether they, or one of them, may limit liability under the provisions of Sec. 183(a). Concerning this Section, Gilmore & Black in The Law of Admiralty, Sec. 10–7, p. 668, have said, "Sec. 183(a) thus states in terms of the utmost generality, the types of claims against which the privilege of limitation is conferred, conditions the privilege on the absence of 'privity and knowledge' on the part of the owner, and sets, as the maximum liability of an owner entitled to limit, his interest in the vessel and her pending freight." There have been amendments [12] but for the purposes of this discussion, we are concerned with the correct interpretation of the words "privity and knowledge" insofar as they relate to the facts of this case. It is elementary in Admiralty law that if, when a ship leaves port, the owner, master, etc., knew or should have known that she was unseaworthy due to some unsafe condition, or was improperly equipped or manned, and loss of life, personal injury or property damage results therefrom, he is not entitled to limit his liability. The Cleveco, 6 Cir., 154 F.2d 605. It is equally clear that such a petition should be granted where injury, death or loss of property results from unseaworthiness due to a defective ship, equipment or improper manning which is neither known nor with the exercise of care could have been ascertained prior to the ship's departure.[13]

Now let us apply these principles to the following findings of fact. As far as I can ascertain from the record, the Mission was manned by a competent set of officers and in control of a responsible pilot. Without doubt one of them was guilty of negligence but the evidence does not suggest that any of these officers came within the category of the Master of Ship A in the footnote. The pilot had a license for these waters and from the meager evidence about him, appears to have been a fairly elderly, competent pilot of long experience. The complainants contend that the strange and unseamanlike behavior of the Mission both at Cross Ledge Light earlier in the evening and again at the time of the collision point to a pilot of such incompetence as to justify a finding of unseaworthiness. I cannot agree. Both incidents obviously occurred after the Mission left port and the testimony does not suggest that Pilot Smith had a reputation for incompetency prior to these events which reasonable inquiry would have revealed. Nor, for that matter, are we absolutely certain that the Pilot was in control at the time of collision for, as I understand it, a Master has the right to take over control from a Pilot in an emergency. Again, it is possible that he became ill, which forced the Master or some other officer to replace him. The lips of those who knew are sealed and it is idle to engage in speculation. It is my conclusion that the record does not justify a finding of unseaworthiness because the Mission was improperly manned.

On the other hand, the evidence raises most serious implications concerning the practice of the tanker trade in permitting ships to leave port with their tanks in a dangerously combustible state. In this connection, the record justifies the following findings. It is generally known that gasolines of various grades including the jet fuels are highly volatile. The serious danger, however, arises not

12. Knowledge of the Master, Superintendent or Managing agent at or prior to the commencement of the voyage is now deemed to be knowledge of the owner and in no event can an owner limit its liability to an amount less than $60 per ton in case of death or injury.

13. For example, Ships A & B are in collision and each was negligent as the result of her Master's being intoxicated. The Master of Ship A was a known drunk when he was hired. The Master of Ship B was employed after due inquiry had indicated that he was an excellent seaman and of sober habits. The owner of A could not limit his liability but the owner of Ship B could. Compare The Anna, D.C., 47 F. 525.

so much from the fuel itself, but the vapors let off from the fuel. A fire in a tank of gasoline is indeed dangerous but nothing compared with the explosion of gasoline vapors mixed with air. Thus, the right combination of vapors and air existing in an empty tank can produce an explosion many times more destructive than dynamite. Parenthetically, it may be said that the explosion of the Mission was perhaps the most violent ever known in the tanker trade and it was completely fortuitous that the major forces of the blow were dissipated under water. Otherwise, the loss of life and injury would have been much worse. Pumping gasoline fuels out of a tanker's tanks does not render them free of dangerous vapors because scale or rust accumulating on the sides of the tanks soaks up a percentage of the fuel and gradually lets off vapors into the empty tanks. The Mission's tanks had considerably more than a normal accumulation of scale just prior to this accident, so much that it occasioned an exchange of radio messages between its captain and Mathiasen some little time prior to the accident. There are only two known methods of substantially gas freeing a vessel's tanks. These are by Butterworthing and the use of flue gas. Whether either method is capable of rendering a vessel's tanks completely free of vapors is debatable but both will go a very long way towards reducing the danger.

Butterworthing takes its name from the Butterworth machine which is lowered into the tanks after the cargo is discharged. These machines have two rotating nozzles which pump hot sea water, heated just under steam temperature, into the tanks. After the tanks have cooled off, the crew is sent into the tanks to free the scale, hose down the tanks and clean them of sludge and the residue of the scale, etc. This residue must be taken up in buckets which cannot be dumped less than 100 miles from shore. Butterworthing can be done on a short coastal voyage by accumulating the sludge and scale in one of the tanks. Ordinarily, the Mission could have been

Butterworthed during this voyage and the danger thus substantially reduced, but half of her machines were out of order and, moreover, by the standards of the trade, this being a short voyage, it was not considered necessary to Butterworth because of the time element.

The other means of reducing the dangerous vapor content of a tank is by the introduction of flue gas. Flue gas is manufactured on board ship and by a method not necessary to relate here is introduced into the tanks. One of the tankers in the Mathiasen fleet uses flue gas. The Sun Oil Company has equipped all its tankers with the flue gas system. The Standard Oil Co. of California had such a system but discontinued it presumably because it takes some 17 hours after the voyage begins to render the job effective and, like Butterworthing, the method is not practicable for shorter voyages. Moreover, the method is expensive. The evidence discloses no case of an explosion in a tank where flue gas has been used.

██ The conclusion is inescapable that both Butterworthing and the flue gas method in the tanker trade are accepted means of sharply reducing the danger of explosive vapors in tanks but are not employed on short voyages because time would not permit.

Jet fuel is considerably more dangerous even than aviation gasoline. Whereas in the latter, the danger is present only with the introduction of a certain mixture of air, in the former there is continuous danger of explosion.

Instruments exist, in any event, which will measure and disclose dangerous accumulations of gas in tanks. Thus, the owners of the Mission knew or should have known that when she began her last voyage, her tanks were in a condition of danger comparable to the transportation of a cargo of explosives. There is no evidence that Mission was equipped with such instruments.

#### The Government's Petition to Limit Liability

The government's argument in support of its petition to limit liability is this.

Regardless of the highly combustible condition of the Mission's tanks, they were potentially no more dangerous than a cargo of explosives and it is settled law in this country that the storage or transportation of dangerous explosives without independent acts of negligence is not actionable. From this it is maintained that the government, having been guilty of no negligence, would not be liable at common law for the results of an explosion and, therefore, is entitled to limit its liability.[14]

■ The government is correct in taking the position that the doctrine of liability without fault laid down in the leading English decision of Rylands v. Fletcher, 1 Eng.Rul.Cas. 256 (1868), has not generally been accepted in this country. There is neither the time nor the necessity for a full review of the American cases dealing with this subject. To say that they are in confusion would be an understatement. An examination of the cases indicates that, in general, he who carries on an extra-hazardous activity such as the storage of explosives will not be held liable unless guilty of independent acts of negligence. Actiesselskabet Ingrid v. Cent. R. Co. of New Jersey, 2 Cir., 216 F. 72. Standing almost alone to the contrary are the Restatement of the Law of Torts, Sec. 519 et seq.; Green v. General Petroleum Corporation, 205 Cal. 328, 270 P. 952, 60 A.L.R. 475 (oil well blow and fire) and Exner v. Sherman Power Construction Co., 2 Cir., 54 F.2d 510, 80 A.L.R. 686 (storage of explosives).[15]

Nevertheless, a substantial body of law has grown up in this country holding that he who carries on an extra-hazardous activity near buildings and points such as highways, where people are apt to be present, is guilty of a nuisance and liable for injuries resulting from such dangerous activities with or without fault. Annotation 80 A.L.R. 692. Certainly, it could be argued most persuasively here that the government, charged with the knowledge that the Mission's tanks were in a dangerous state, was guilty of a nuisance in permitting the vessel to operate up the narrow, crowded channel of the Delaware River into the heart of the populous Delaware Valley.

■ However, it is unnecessary to decide this point for, in my view of the case, the Mission in any event was also guilty of negligence to which the government was privy. Her owners were charged with the highest degree of care, knowing that her tanks contained explosive substances. Annotation 31 A.L.R. 725. Thus, the facts compel the conclusion that the owners or operators should never have permitted this vessel to proceed on her voyage without first taking all accepted precautions to render her gas free. This was impossible because at least half (5) of her Butterworthing machines were out of repair. Nor will the government be heard to say that the standards of the tanker trade did not require Butterworthing on a short voyage because of the delays involved. The slogan that "time is money" may have its place in business but is unacceptable where human safety is involved. If the Mission could have been rendered gas free, or essentially so, by a day or so's delay (and she could), then she should have been taken off her run until she was safe to operate in crowded sea lanes. In the alternative, the more expensive, but effective, flue gas system should have been installed. The tanker industry cannot hoist itself by its own boot straps through the device of setting up standards of conduct amounting to something less than rea-

14. Whether this argument would hold in Admiralty, where different principles apply and where the burden is on the petitioner, is debatable. Generally, it would seem to be sound but it may be open to question in a case such as this. It is unnecessary to decide the point in any event.

15. It may be said here that it is to be hoped that in a proper case Courts in the not too distant future will begin to take their stand by the side of the Restatement in an effort to bring the American law more into step with the demands of modern conditions.

sonable care under all the circumstances and then predicate a defense on such sub-standards. The Federal and State Courts have long since laid to rest the ghost of this argument. As stated in The T. J. Hooper, 2 Cir., 60 F.2d 737, 740:

"Is it then a final answer that the business had not yet generally adopted receiving sets? There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. Ketterer v. Armour & Co. [2 Cir.] 247 F. 921, 931, L.R.A.1918D, 798; Spang Chalfant & Co. v. Dimon, etc. Corp. [2 Cir.] 57 F.2d 965, 967. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. *It never may set its own tests, however persuasive be its usages.* Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." (My emphasis.)

See also State to Use of Henderson v. Clark, 2 Terry 246, 41 Del. 246, 20 A.2d 127, 130, 138 A.L.R. 704:

"But there is a more fundamental objection. The Sheriff was charged with the duty to exercise that degree of care in the keeping of the crane which men in general exercise over property of like class. The custom or practice shown related only to the care which Sheriffs of New Castle County were accustomed to exercise over ponderous property under levy. The substantive law tells us what the standard of conduct for negligence is, and that standard is a fixed one, independent of the conduct of others. To take the conduct of others as furnishing a sufficient legal standard of negligence would be to abandon the standard set up by the substantive law. 1. Wigmore, Ev. 834. As said by Holmes, J. in Texas & P. Ry. Co. v. Behymer, 189 U.S. 468, 23 S.Ct. 622, 623, 47 L.Ed. 905, 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence.' What has been done by others previously, however uniform in mode it may be shown to have been, does not make a rule of conduct by which the jury are to be limited and governed, if they see in the case under consideration that it is not such conduct as a prudent man would adopt in his own affairs. Maynard v. Buck, 100 Mass. 40.

"Custom cannot change the quality of an act; it can only aid in determining what that quality is. A party cannot by his own continued negligences establish a custom by which he is made exempt from liability; nor is legal responsibility for negligence mitigated by the fact that others have been alike negligent. * * *."

 There was negligence here in which the owners and operators concurred in not having the available equipment (either Butterworthing machines or the flue gas system) in order to gas free the Mission before permitting her to steam, as dangerous as a ship laden with explosives, through relatively crowded, narrow channels. The petition of the United States and/or Mathiasen for limitation of liability will be denied.

The Elna's Petition to Limit Liability

Two major reasons are advanced by the claimants for denying Elna's petition to limit liability. First, it is argued that none of her officers, deck or engineering, was properly licensed. Secondly, it is contended that she was undermanned. These omissions, it is urged, constitute violations of statute which under the Pennsylvania rule compel a holding of unseaworthiness.

 I do not regard the first point as persuasive. Admittedly, Capt. Kaare

violated the Liberian statute requiring ships' officers to obtain a Liberian license "as soon as reasonably practicable" but I can see no connection whatever between this fact and the collision. He had followed the sea since a boy and had been the Master of Estonian, Russian, German, Honduran and Liberian ships. He had a permanent Estonian license for all seas. After the collision, and without any examination as to physical fitness or competency, he obtained a Liberian license by mail, demonstrating the ease with which such licenses were issued. Under such circumstances I decline to apply the harsh Pennsylvania rule. Decisions will be found holding that, regardless of competency, the presence of an unlicensed officer on duty at the time of collision is sufficient to invoke the so-called Pennsylvania rule. The Walter D. Noyes, D.C., 275 F. 690.[16] However, the issue here is what bearing did Capt. Kaare's failure to possess a Liberian license have on this collision which resulted, not from inexperience, but a mistake in judgment? Or, stated otherwise, would the accident have been less likely to have happened, if Capt. Kaare, a week prior thereto, had obtained a mail order Liberian license? The answer must be a clear "no".[17]

▆▆▆ Was Elna undermanned? A rather plausible superficial argument may be made out in the affirmative. Her permanent certificate of registry provided for 26 officers exclusive of the Master. She had 23 officers and men exclusive of the Master. Moreover, the Master stated on the stand that, by his standards, she was undermanned. In my opinion, however, the correct meaning of proper manning goes further than numbers unless, as may be true in the United States, the number falls below some positive statutory command in which case there is a violation of statute and the Pennsylvania rule comes into play.

▆▆▆ The Liberian statute provides in effect that no vessel under the flag of the Liberian Republic shall be navigated "unless she shall have in her service and aboard such complement of licensed officers and crew * * * as may be necessary for her safe navigation."[18] (My emphasis.) It seems to be settled law in the Admiralty that a foreign owner who has complied with the domestic safety laws of his own country may limit his liability under our law although he has failed to comply with our safety laws. The Princess Sophia, D.C., 278 F. 180.[19] Thus, the question arises, was the Elna manned in accordance with the requirements of the Liberian law? It is true that her crew fell below the number required by her certificate of registry. But this is not conclusive of undermanning. In re Meyer, D.C., 74 F. 881, it was held in effect that where the number of crew fell below that specified in her certificate of registry, she was not necessarily deemed unseaworthy because undermanned. Compare Boston Marine Ins. Co. v. Metropolitan Redwood Lumber Co., 9 Cir., 197 F. 703. And there are a number of cases holding in the reverse that merely because a vessel has her full complement in numbers of officers and crew, she is not fully manned in the sense of being seaworthy. For example, in The Gentleman, Fed.Cas.No. 5,324, the crew was adequate in numbers but the petition to limit liability was denied because they were all sick with fever when hired on. And in In re Pacific Mail Steamship Co., 9 Cir., 130 F. 76, 69 L.R.A. 71, a vessel which had a full complement of crew (Chinese), not able to understand commands in English, was held unseaworthy and her petition to limit liability denied.

16. But see The Eagle Wing, D.C., 135 F. 826, 832, where the Court, after noting that the mate was unlicensed said, "Moreover, he was a person that it is highly probable would never have been licensed."

17. Compare decisions in automobile accidents holding that failure to hold a drivers license does not of itself render a driver liable unless there is a causal connection between the accident and the violation of the statute requiring a license. 60 C.J.S. Motor Vehicles § 134.

18. 46 U.S.C.A. § 222, is in almost the same language but is supplemented by other statutes calling for a specific number of mates, etc.

19. This rule should, of course, not be carried to an extreme.

Thus, it would seem that under a general statute, such as that of Liberia, it is not numbers alone which determines undermanning, but, rather, whether the officers and crew were competent in the broad sense of the word, including numbers, for her "safe navigation". If so, then the mere fact that she did not comply with all American safety statutes (Sec. 223, 46 U.S.C.A., for instance, requires a Master and three mates) is not alone conclusive.

She was short but two men in her complement of crew for I assume that the absence of a second mate, almost universally carried on vessels of her size in inland waters, constituted the remaining deficiency. But she had an experienced mate on the bow watch, her Master, a competent helmsman and pilot on her bridge and engineers in her engine room. In every respect, her key positions were manned by able, experienced mariners just before collision. Therefore, but for one thing, the presence of a second mate, or a third mate, for that matter, would have added nothing to her "safe navigation" at the time. The one thing is the physical condition of the Captain as the result of having been up and about his ship for 16 hours immediately preceding these events. The claimants assume he must have been fatigued but there is no direct evidence of the fact. He denied it. His duties that day had been unusually light because the ship was docked. Although then 62 years old, he had every appearance of health and vigor. True, because of the shortage of officers, he had to stand two watches that day.[20] But he was in the opening minutes only of the second watch. His actions preceding collision fail to reveal weariness or inattention. He saw Mission fifteen minutes before collision and followed her progress. He saw that she had made her turn into Bulkhead Bar Range and was proceeding up this range approximately in the center of the channel. He obviously concurred in the pilot's decision to give one blast indicating the proper port to port passage. He worried when Mission failed to answer Elna's signal. Up to two minutes before collision, the Elna was not at fault in her navigation. But, as previously found, I have no doubt that he and the pilot were mistaken in judgment in failing to give the danger signal. Was this the result of fatigue or simply bad judgment? Pilot Taylor on the Gulf Lube, for instance, seems to have followed the same course and there is no proof that he was tired. In the absence of any positive indication of physical fatigue, a finding to that effect would be based on nothing but speculation.

Nor am I convinced that Capt. Kaare meant anything more by his statement (that Elna was undermanned by his own standards) than that she was short in her complement. His understanding of English was very imperfect and it would not be fair to read into his answer something which he may not have intended.

In many respects the Petition of Diesel Tanker A. C. Dodge, Inc., D.C.E.D.N.Y., 133 F.Supp. 510, affirmed 2 Cir., 234 F.2d 374, certiorari denied The A. C. Dodge, Inc. v. J. M. Carras, Inc., 352 U.S. 928, 77 S.Ct. 227, 1 L.Ed.2d 163, furnishes a strong analogy. There, the tanker Dodge, southbound, and the T2 tanker Michael, northbound, collided in the Delaware River. The Court found that the Michael gave one blast for a port to port passing which the Dodge answered with a similar acknowledgment, whereupon the Michael suddenly gave two blasts. The Dodge failed to give the danger signal at this point. The Court found the Michael predominantly at fault in the resulting collision following which both vessels took fire and there was substantial loss of life. It also found the Dodge at fault for failing to give the danger signal when the Michael gave two blasts. With respect to undermanning,[21] the Court had this to say:

"The claimants seek to defeat limitation by arguing that the Dodge

---

20. A watch when the ship is docked may make little demand on one's energies.

21. The Dodge had sufficient competent crew to navigate inland waters but, due to

was undermanned, with the result that those in charge of her navigation must have been suffering from fatigue. This argument might have weight if the evidence demonstrated faulty navigation on the part of the Dodge, but as has been seen such is not the effect of the testimony. Therefore the argument reduced to lowest terms means that the undermanning, if it existed, automatically deprived the Dodge of the right to limit, in spite of the fact that she was run down and sunk by the Michael, whose eccentric navigation is deemed by this court to have been the predominant cause of the disaster." [133 F.Supp. 519.]

Thus, the Court *assumed* undermanning but permitted the Dodge to limit liability because the Michael was predominantly at fault. The Second Circuit Court of Appeals affirmed and the Supreme Court denied certiorari. In end result, then, the Second Circuit Court seems to have held that a violation of statute would not defeat a limitation proceeding if the other vessel was predominantly at fault in her navigation. It would seem, therefore, that the Second Circuit Court of Appeals was interpreting and applying the rule of the Pennsylvania with a great deal less harshness than is the case in many Circuits. Compare the actual language of the Supreme Court in The Pennsylvania elsewhere quoted at some length.[22]

Since, in any event, I feel there is no convincing evidence of undermanning, and through fear that the Third Circuit might lean to a more rigid interpretation of the Pennsylvania rule, rather than assume undermanning in the first instance and then find no causal connection between it and the collision as did the New York Court, I would prefer at the outset to make a finding that there was no undermanning within the meaning of the Liberian statute. It is my conclusion that at the time of this occurrence, despite a shortage of personnel, the Elna had an adequate complement of officers and crew for her "safe navigation", and there was no causal connection between the deficit in numbers of crew and the collision. It is accordingly unnecessary to consider the effect of the rule of the Pennsylvania.

The petition of the Elna to limit liability is granted.

What has been said here may be deemed to constitute findings of fact and conclusions of law from which, I have no doubt, an appropriate order can be framed.

Order upon notice.

### On Claim of Henri V. Rice in Admiralty No. 1765

The Pilot, Rice, filed a claim in these proceedings alleging that he was injured in the collision. The United States and Mathiasen's filed a cross-claim against him. In view of what has been found previously but two other points need be discussed here. Rice's Proctor has advanced the argument (also available to the Elna as a defense) that under certain circumstances such as here, at the last point where Mission might have made her right turn safely, it was too late for Elna to have taken evasive action if, as was the case, Mission did not thereafter make her turn. The short answer to this is that Elna knew that Mission had failed to answer her first one-blast signal and was immediately put on notice that something might be wrong. Had Mission

a blockage of the Delaware and Chesapeake Canal, she had to go to Baltimore via Cape Charles, a coastal voyage. Her certificate of registry required more than her complement then on board for costal voyages. But the accident happened in inland waters. Technically she was undermanned in numbers because her voyage, a coastal voyage, began before collision.

22. "In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, *but that it could not have been.*" (My emphasis.)

given the one-blast acknowledgment and then kept on her course to a point dangerously close to the center line of the channel without turning, Elna might still have safely assumed that Mission would make her right turn at the very last second. But in my judgment, she had no right to make this assumption where Mission had failed to answer her first one-blast signal. Moreover, the testimony of both Heinmaa and Martel, bow watches for the respective ships, indicates that each thought collision was imminent *before* the Elna's second blast. The argument, while ingenious, is not persuasive.

Secondly, the conduct of Pilot Taylor, when the Gulf Lube was almost crowded out of her channel earlier by Mission, is cited as evidence that Rice's judgment was not at fault when he sounded a second one-blast rather than the danger signal. I do not have the full evidence before me as to the Cross Ledge Light incident and obviously cannot pass judgment on Pilot Taylor's actions. Two observations may be pertinent, however. First, speaking generally and without detailed knowledge of the facts, I am by no means sure that Taylor should not have sounded the danger signal. Judging from aftersight, a good case can be made out for the proposition that he should have sounded the danger signal and it was mere luck that Mission made a last-minute turn thus avoiding collision. Secondly, quotations from two authorities have been given elsewhere laying down the well-known principle of law (and, for that matter, of common sense) that the conduct of others is not necessarily evidence of reasonable care. If this were true, as observed earlier in the opinion, the Pilot Association, by establishing sub-standards of conduct could emasculate the Rules of Navigation.

▄▄▄ Much as I dislike to see the heavy burden of liability in a case such as this fall upon an individual, I can come to no other conclusion than that Pilot Rice must share the responsibility with Captain Kaare of a mistake in judgment in failing to sound the danger sig-

nal at, or even slightly before, he sounded the second one-blast signal.

An order will be entered in conformity herewith.

## Supplement

A number of contentions pressed with some force by one or the other of the parties are better answered here than in the main body of the opinion thereby somewhat disturbing its continuity.

### The Exact Point of Collision

It is urged upon me that this case cannot be intelligently decided without making a finding as to the exact spot of the collision. I have contented myself with a finding that it occurred close to Buoy 1D and deem it unnecessary to be more explicit. There is some merit to the government's argument that, because Mission sank some 1380 feet north and east of Buoy 1D, she may have been farther on her own side of the channel than testified to by the Elna witnesses, Heinmaa, Kaare and Rice. Suppose she were? Mission's main faults were, (1) failing to acknowledge Elna's one-blast signal and (2) proceeding too far into the center of Bulkhead Bar Range before starting her 34 degree turn into Deepwater Range. In fact, she started this turn, if at all, so late that she came well over into the wrong side of the channel. If, therefore, Mission kept her own side of the channel longer than Elna's witnesses thought, there can be no substantial difference in result. Nor, if Mission were a little less, and Elna a little more, negligent than here found, would the result be different.

It may be, for all we know, that the collision was slightly more north and east of Buoy 1D than estimated and that this fact plus the following tide carried her farther upriver than would appear possible from the testimony of Elna witnesses. Again, I see little value in exploring a profitless avenue of inquiry.

### The Government's Witness, Schoenherr

▄▄▄ The government produced Dr. Schoenherr, a civilian naval expert, to prove that the point of collision must

have been much farther north and east of Buoy 1D and closer to Mission's side of the channel than was supposed. I have answered this point above. In any event, it is my opinion after reflection that the testimony of Dr. Schoenherr, though of extreme interest, was inadmissible. The reason is that, through no fault of his, a number of his important conclusions were based upon assumptions not appearing in the record at all but furnished by government counsel.

#### The Mission's Instruments

■ Mission's bridge instruments, the Sperry compass, etc., were salvaged, offered at the trial as exhibits and interpreted by experts. From their testimony, it might be argued that Mission was on her own side of the channel and actually made her 34 degree turn into Deepwater Range—in other words, Elna was on the wrong side of the channel and at fault. I do not accept these interpretations. These instruments are delicate, were subjected to the terrific shock of the explosions which completely destroyed the Bridge upon which they were fastened and, moreover, were submerged for a considerable time. Furthermore, to accept the results of interpreting the instruments is to reject the testimony of Heinmaa, Kaare and Rice, all experienced seamen, familiar with the channel and who, I am confident, were attempting to tell the truth in accordance with their best recollections.

#### The Doctrine of Major & Minor Fault

■ The Elna advances this theory and insists that it is applicable here. I do not agree. It is a recognized doctrine but seldom applied, almost never where the vessel asking for its applications has violated a statute as did Elna in failing to sound the danger signal. Indeed, a reading of Tide Water Associated Oil Co. v. The Syosset, 3 Cir., 203 F.2d 264, an opinion of this Circuit, precludes any serious thought of adopting the rule here. As a matter of equity it might be applicable in a proceeding strictly between Mission and Elna to assess damages, because there are times when the application of the 50-50 formula of dam-

ages is unfair to the vessel guilty of comparatively minor fault. Actually, in most of the cases recognizing the rule, damages were the sole issue. But where, as here, the claims of innocent parties are concerned, I see no reason at all for applying the doctrine.