Petition of **OSKAR TIEDEMANN AND COMPANY** for Exoneration from or Limitation of Liability.

Oskar Tiedemann and Company,
Appellant,

Sabine Transportation Co., Hess Inc., American Trading & Production Corp., American Oil Company, Atlantic Refining Company, California Shipping Company, Cities Service Oil Company, Gulf Oil Corporation, Humble Oil & Refining Company (Esso), Keystone Shipping Company, National Bulk Carriers, Sinclair Refining Company, Socony Mobil Oil Company, Sun Oil Company, Texaco, Inc., Tidewater Oil Company and Trinidad Corporation, amici curiae.

Petition of **UNITED STATES** of America and Mathiasen's Tanker Industries, Inc., for Exoneration from or Limitation of Liability as Owners of THE U.S. N.S. MISSION SAN FRANCISCO.

United States of America and Mathiasen's Tanker Industries, Inc., Appellants.

Nos. 13258, 13259.

United States Court of Appeals
Third Circuit.

Argued March 6, 1961.

Decided April 10, 1961.

Rehearing Denied May 25, 1961.

Harold G. Wilson, Washington, D. C. (William H. Orrick, Jr., George Cochran Doub, Asst. Attys. Gen., Leonard G. Hagner, U. S. Atty., Wilmington, Del., Morton Hollander, George Jaffin and Robert D. Klages, Attys., Dept. of Justice, Washington, D. C., on the brief), for the United States and Mathiasen's Tanker Industries.

T. E. Byrne, Jr., Philadelphia, Pa. (John W. Ennis, Jr., Krusen, Evans & Shaw, Philadelphia, Pa., P. A. Beck, New York City, Ernest S. Wilson, Jr., Morford, Young & Conaway, Wilmington, Del., on the brief), for Oskar Tiedemann & Co.

Arthur M. Boal, New York City (Raymond T. Greene, New York City, Richard F. Corroon, Wilmington, Del., Boal, McQuade & Fitzpatrick, Kirlin, Campbell & Keating, New York City, Berl, Potter & Anderson, Wilmington, Del., on the brief), for amici curiae.

Abraham E. Freedman, Philadelphia, Pa. (Marvin I. Barish, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for claimants-appellees.

Before GOODRICH, McLAUGHLIN and FORMAN, Circuit Judges.

GOODRICH, Circuit Judge.

These appeals, heard together, arise from interlocutory decrees (28 U.S.C. § 1292(a) (3)) of the United States District Court for the District of Delaware. That Court refused both exoneration and limitation of liability to the United States and Mathiasen's Tanker Industries, Inc. and denied exoneration but granted limitation of liability to Tiedemann and Co.[1] The opinion fully and carefully discusses the Court's reason for both conclusions. 1959, 179 F.Supp. 227.

The litigation arises from a collision between the ship USNS Mission San Francisco (hereafter called "Mission") and the SS Elna II ("Elna"). Mission was a navy tanker operated by Mathiasen's Tanker Industries, Inc. The Elna is an old cargo ship operated under the Liberian flag, owned by Oskar Tiedemann and Company. The collision occurred about 12:20 in the morning of March 7, 1957. The Mission was proceeding up Delaware Bay. She had discharged a cargo of jet fuel (grade JP–4) at Newark, New Jersey, the day before and was returning to Paulsboro, New Jersey, to take on a new cargo. Elna was southbound. She had discharged a cargo of pulp wood at Wilmington and was proceeding to Baltimore.

Too full a description of the vicinity of the collision will not help in understanding the legal questions here involved. But a short summary will be useful. The general area is called "Goose Point" on the New Jersey side. A northbound vessel leaves New Castle Range by making a 34° turn to starboard on what is called

---

1. This litigation commenced with a libel filed by Tiedemann against the United States and Mathiasen pursuant to 46 U.S.C.A. § 781. The United States and Mathiasen filed an answer and cross-libel. Thereafter, Tiedemann filed a petition for limitation of or exoneration from liability. 46 U.S.C.A. § 183 et seq. The United States and Mathiasen filed a joint petition for limitation or exoneration. A number of crew members of each ship involved in the collision and representatives of deceased crew members filed claims for personal injuries or death and answered and excepted to the petitions filed by Tiedemann and the United States and Mathiasen. There were also claims and exceptions by the petitioners against the petition of the other. The majority of the seamen of both ships were represented by one counsel who participated actively in the proceedings in the District Court and represented the claimant-appellees before this Court. The District Court consolidated all these matters for all purposes except the determination of damages.

the Bulkhead Bar Range. This is a short range about 1200 yards in length. It, in turn, leads into Deepwater Point Range. The vessel must make another 34° right turn into Deepwater Point Range. Some vessels navigate the bend in two distinct turns; others make one sweeping turn especially at floodtide.

Mission was proceeding northbound at floodtide and, with the help of the tide, going about 22 land miles an hour. The vessels were visible to each other some 15 or 20 minutes before the accident and Elna saw Mission's mast lights across Goose Point when the vessels were perhaps four miles apart.

As the District Court said [179 F. Supp. 231], "there was something terribly wrong on the bridge of the Mission that night." Further down the river Mission had crowded another tanker called Gulflube almost out of its channel. As she proceeded in the direction of Elna she kept up her speed, stayed either in the middle or slightly to the New Jersey side of the river and failed to acknowledge both the signal from her own lookout at the bow and the port-to-port signal blown by Elna. After a short interval Elna blew a second signal blast. By this time the catastrophe was inescapable. Elna reversed her engines. Whether this procedure had become effective or not is not of the greatest importance for it was too late to avert the collision. Immediately after the ships struck the tanks on Mission exploded. The bridge and the midship housing collapsed into the hull the sides of which were blown out by the force of the explosion. The pilot and the navigating officers of Mission were killed. Mission's own speed kept her going in the neighborhood of some 460 yards beyond the point of explosion when she sank.

 We need not spend much time discussing the fault of Mission in causing the collision. She violated Article 25 of the Inland Rules (33 U.S.C.A. § 210) directing that in a narrow channel steam vessels are to keep to that side of the fairway or mid channel which lies on their starboard side. She also violated Article 18, Rule 1, 33 U.S.C.A. § 203, in failing to acknowledge the one blast signal of Elna. These two statutory violations and her faulty navigation in general were clearly causal. The district court properly denied exoneration to the United States and Mathiasen.

The chief subject of controversy when the case was presented to this Court had to do with the negligence or lack of negligence on the part of the Mission for the condition of the empty tanks. The district court concluded that there was negligence in this regard and that the United States and Mathiasen had privity and knowledge of the negligence. This defeated their petition for limitation of liability.

When jet fuel is pumped out of the tanks upon unloading of the cargo, vapor is generated by the fuel which remains at the bottom of the tanks and on the sides. This vapor mixed with air is dangerously explosive. While the Government's argument objects to the trial court's characterization that Mission was "as dangerous as a ship laden with explosives" we need not discuss whether the analogy is perfect or not. There was plenty of testimony showing the relations of air and vapor which made the mixture dangerous or nondangerous according to the proportions of each and that the mixture was a dangerous one in this case is certainly shown by what happened.

The core of the controversy is whether adequate precautions were taken. What the Mission did was to close the tanks. This, it was vigorously argued, was the safest way to handle the matter and the way, it was testified, the industry does. The theory is that this prevented outside sources of ignition from reaching the explosive vapors. So, all that was done on this short voyage by the Mission was to close the tanks and nothing else.

There are at least two ways of treating the tanks to lessen the danger of explosion. One is the flue gas system. Following this system the tanks are filled with an inert gas which is secured by

scrubbing the gas from the ship's funnels and injecting it into the tank. This inert gas keeps the oxygen out and thus prevents the likelihood of explosion. Argument was made that this system would be ineffective if the sides of the ship were broken in a collision. However, there was expert testimony that the introduction of oxygen in this manner would not occur at such a rapid rate as to cause a dangerous vapor mixture instantaneously or even in a short time. This, it was shown, is an accepted method and is used by one line on every tanker.

Another method is what is called the process of "Butterworthing." A Butterworth machine pumps water heated to 180° into the tank. This loosens the sludge, rust and dirt. When the tanks are cooled, the water is pumped out. The tanks are left open and the vapor [2] blown out, either mechanically or by the use of windsails. Then the loose sludge is put into buckets, pulled up and disposed of. The Government's argument and some of the testimony is inclined to pooh-pooh the efficacy of the Butterworthing process. The Mission, however, did have some Butterworth machines, but they were not used on short voyages because of the time involved.[3] Also, the trial court found that half of them were out of commission. While the Mission had been Butterworthed on an earlier voyage the machines were not used in this instance.[4]

■■■■ There was expert testimony on both sides.[5] The trial court concluded that there was negligence [179 F.Supp. 239] "in which the owners and operators concurred in not having the available equipment * * * in order to gas free the Mission before permitting her to steam * * * through relatively crowded, narrow channels." Our standard for review of the district court has been clearly set forth in McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. Unless the findings of fact by the district court are clearly erroneous we are to accept them. The findings which sustain the conclusion that "there was negligence here" are sustained by the record and not clearly erroneous. While the statement that the owners and operators "concurred" in the negligent conduct might be termed a "conclusion" rather than a "finding," it has substantial support in the record. We hold that there was such privity and knowledge of the owners and operators of the Mission as to deny them the right to limit liability. 46 U.S.C.A. § 183.

2. The district judge discussed Butterworthing as a method of gas freeing a tank. The United States and Mathiasen have vigorously denied that this process will reduce vapors at all, insisting that scrubbing down the tanks, by Butterworthing or otherwise, is only a pre-condition for an effective gas freeing operation. There was positive testimony given by a witness for the Government that Butterworthing would reduce the vapor contents of the tanks. There is no need to decide whether the Butterworthing operation actually does gas free, since in our reading of the District Court's opinion we understand the district judge to be using the term Butterworthing as descriptive of the entire washing, ventilating and scraping procedure.

3. The description of the time involved (up to 9 days) by witnesses for the Government and Mathiasen must be placed against the background of the ineffective functioning of the machines creating the necessity to hand hose the tanks and use only parts of the days in question.

4. There was testimony that Butterworthing had been attempted in late February of 1957, but that the machines had failed to operate and the crew proceeded to hose out some of the tanks by hand.

5. The tanker industry presented briefs and argument to this Court as amici curiae and also attempted to intervene and re-open the case below. They attempted twice before this Court to secure permission to introduce additional evidence. After a careful consideration of the record and their "offers of proof" we find no basis for allowing additional evidence to be presented. The expert testimony offered below clearly presented the issue to be decided. Moreover, as the district judge indicated in his opinion denying the motion to reopen the case, this was not a matter of surprise or after-discovered evidence or "any other hardship." The Government, which represented the tanker industry in this case since it owned the Mission, was well aware of the dispute raised and presented expert testimony to meet the charges of negligence.

■■ The situation with regard to the Elna is quite different from that of the Mission. Elna was certainly more sinned against than sinning. She was proceeding downstream at a moderate pace on her own side of the channel. She observed the Mission while that ship was some three to five miles away, because the land along the Delaware at this point is flat and the curves have already been described. But there was nothing about the Mission's appearance at that point to give any indication of danger. The Mission was going rather rapidly but at the point where first observed there was nothing alarming about that. The case is not like our problem in the Syosset where the offending vessel was zigzagging in a way to give warning that something was wrong with the operation. Tide Water Associated Oil Co. v. The Syosset, 3 Cir., 1953, 203 F.2d 264. In fact, everything was fully compatible with a normal meeting of ships up to the time when Elna gave her first blast indicating the ordinary port-to-port passing. Up to then everything was calm as the night itself. But Mission did not respond to this passing signal and she should have (33 U.S.C.A. § 203) although we were told that sometimes a vessel does not answer that signal unless she wants to say something in response. At any rate, when there was no immediate answer to the signal, which we have no way of knowing now was or was not heard, Elna waited just a little and then blew a second passing signal and not a warning blast. Elna also did not give a signal to the Mission when she reversed her engines. We cannot think that this had anything to do with the catastrophe as it finally occurred. But now we reach the critical point with regard to Elna's fault or lack of it in the management of the ship just prior to the time of the collision. A quotation from the district judge's opinion is apposite here. He said: "It is almost impossible to have listened closely to the testimony at the trial, in connection with a careful examination of the charts, without coming to the regrettable conclusion that Elna waited too long before taking any action to avert collision." He cites Rule III, Article 18 of the Inland Rules (33 U.S.C.A. § 203) providing that when a vessel fails to understand the course or intent of another, from any cause, the vessel in doubt should give several short and rapid blasts, not less than four. To support the regrettable conclusion he cites the following considerations: Mission had failed to answer Elna's one blast and had proceeded beyond the point where Captain Kaare of the Elna thought she should have made her turn; the captain was worried and indicated concern to the pilot; the Mission's bow watch thought collision was inevitable even before the Elna's second blast; the full astern order was hopelessly late and that being the case the one-blast signal immediately preceding that order must also have been late. These findings are detailed and clearly supported by the evidence. The court was correct in the conclusion that Tiedemann cannot be exonerated.

■ We now come to the question whether the district judge was incorrect in granting limitation of liability to the Elna. It is charged that the Elna was unseaworthy because she did not have a full crew and that her owner had knowledge of that fact. It is true that her then crew of 23 men plus the master was then short of three members. We think it is fantastic to talk about this having any effect on the catastrophe. The captain was on the bridge; his first mate was a bow lookout. There was also a helmsman on the bridge in addition to the pilot. If there had been any more men they doubtless would have been asleep because the crew had worked all day or else were still working in the hold. The district judge has given us a definite finding on this point. First, he finds that there was no undermanning within the meaning of the Liberian statute and, second, that even if there were a deficient number of crew that fact and the collision had no causal relation. We think on the first he was right and on the second he was clearly right.

It seems too bad that the Elna should be tarred with the same stick as the

Mission in this case. If we had a rule which divided responsibility in proportion to the negligence of the parties, as is the case in many other countries, we could make an equitable adjustment. But our American rule of even division of the damages makes for some hard cases and this is one.

With regret, the judgment as to the Elna will be affirmed.

The decrees of the district court are affirmed in all respects.