Petition of MIDWEST TOWING COMPANY, Inc., a Corporation, for Exoneration from or Limitation of Liability.
No. 3267.

United States District Court
E. D. Illinois.
March 30, 1962.

Edward B. Hayes and William K. Johnson of Lord, Bissell & Brook, Chicago, Ill., and Pope & Driemeyer, East St. Louis, Ill., for petitioner Midwest Towing Co., Inc.

James A. Dooley, Chicago, Ill., and Listeman & Bandy, East St. Louis, Ill., for Richard Anderson, admr. of estate of Robert Anderson, decd., and Mary T. Lusk, admx. of estate of Pleasant M. Lusk, Jr., decd.

Poore, Cox, Baker & McAuley, Knoxville, Tenn., Hulverson & Richardson, St. Louis, Mo., and Goldenhersh & Goldenhersh, East St. Louis, Ill., for Dorothy Yates, admx. of estate of William Yates, decd., and Dale Shirley, admr. of the estate of Dorothy Shirley, decd.

JUERGENS, District Judge.

On March 24, 1955, the Motor Vessel Anna S. Cooper was downbound in the Tennessee River, made up with a tow of four empty barges. Shortly after 9:30 p. m. she approached the so-called Hickman-Lockhart highway bridge at or near mile 100.5 in the Tennessee River. Attempting to pass under this bridge, she came into collision with the left channel span support pier, causing the tow to break up and the M/V Anna S. Cooper to sink.

Midwest Towing Company, Inc., the owner of the M/V Anna S. Cooper (hereinafter sometimes called the Cooper), has filed its petition for exoneration from or limitation of liability.

Robert Anderson (Bobby Lynn Anderson) (hereinafter referred to as Robert Anderson), deck hand; Dorothy Shirley,

cook; and William S. Yates, captain, lost their lives as a result of the sinking. Pleasant M. Lusk, Jr., pilot, left the vessel after the collision but was drowned in attempting to reach shore.

Claims were filed on behalf of the deceased parties; however, the claims made on behalf of William S. Yates and Dorothy Shirley have been resolved and are not now for consideration. Mary T. Lusk, administratrix of the estate of Pleasant M. Lusk, Jr., deceased, and Richard Anderson, administrator of the estate of Robert Anderson, deceased, have filed their complaints to recover from the petitioner for the wrongful deaths of the two seamen, based on petitioner's liability for negligence and breach of duty under the Jones Act, 46 U.S.C.A. § 688.

The petitioner asserts that it is entitled to exoneration from liability or to limitation of its liability for this occurrence.

 It is elementary that any negligence on the part of a vessel resulting from imprudent conduct in her navigation generally or from the violation of a statute will defeat a petition for exoneration from liability if such negligence was a contributing cause to the accident. Petition of Oskar Tiedemann and Company, D.C., 179 F.Supp. 227.

Here the petitioner seeks to claim exoneration from or limitation of liability and argues that the captain of the vessel left a safe mooring at Pickwick Lock on the Tennessee River and attempted to navigate the Anna S. Cooper down the Tennessee River during a raging flood and states that as the result Captain Yates lost his gamble, his life, the lives of three other people and his owner's vessel in consequence. The petitioner seeks to relieve itself from liability in this case by condemning the navigation of the vessel by the captain. By the petitioner's own statements, it was not entitled to exoneration from liability in this case.

In its briefs and during the trial the petitioner attempted to show that the vessel was seaworthy and that loss of the vessel and the members of its crew was exclusively faulty navigation by the captain.

 Before the petitioner is entitled to limit its liability, it must first be shown that the ship was seaworthy for it is clear that there can be no limitation of liability where the owner of a ship knew or should have known that a ship was unseaworthy due to some unsafe condition or was improperly equipped or manned and a loss of life or injury results therefrom.

"It is elementary in Admiralty law that if, when a ship leaves port, the owner, master, etc., knew or should have known that she was unseaworthy due to some unsafe condition, or was improperly equipped or manned, and loss of life, personal injury or property damage results therefrom, he is not entitled to limit his liability. * * * It is equally clear that such a petition should be granted where injury, death or loss of property results from unseaworthiness due to a defective ship, equipment or improper manning which is neither known nor with the exercise of care could have been ascertained prior to the ship's departure." Petition of Oskar Tiedemann and Company, D.C., 179 F. Supp. 227, 236.

 Under the Limitations Act (46 U.S.C.A. § 183) the shipowner is not chargeable with privity or knowledge or with design or neglect when he has used due diligence to furnish a seaworthy ship, but he is so chargeable when he has failed in his duty of due diligence and has sent out a ship unseaworthy in some respect that proximately contributes to the loss. States Steamship Company v. United States, 259 F.2d 458 (9 Cir. 1958).

The question this Court must first resolve is whether or not the Motor Vessel Anna S. Cooper was a seaworthy vessel when she departed downstream on the Tennessee River after leaving the Pickwick Landing; whether or not this unseaworthiness, if it existed, was within

the knowledge of the petitioner; and whether or not the unseaworthy condition of the vessel contributed to causing the deaths of the claimants.

The petitioner asserts that there existed an unprecedented flood on the Tennessee River at the time of the collision; that the captain of the vessel had several days earlier tied the vessel up at Pickwick Landing because of the flood stage of the river; and that he had then communicated with the petitioner and had been instructed to remain at the landing until such time as, in his opinion, it was safe to proceed on the voyage. The petitioner asserts that at the point where the collision occurred there normally existed a current of approximately one-half mile, which flowed straight through the bridge; but that at the time of the collision, due to the flood stage of the Tennessee River, there was a substantial current of approximately eight to ten miles per hour; and that not only was this current greatly in excess of normal, but it likewise was a cross current which had a tendency to force downbound tows into the bridge pier. Petitioner further asserts that the captain of the vessel was familiar with and knew of the conditions that existed on the Tennessee River during flood stage. It asserts that the captain was negligent in attempting to navigate the Cooper and its tow downstream into what the petitioner asserts was a raging flood; that it was this negligence which caused the vessel to be lost, not any defect of the Cooper.

The evidence bears out the fact that the Tennessee River was at high water stage and that there was a substantial current passing under the bridge, where the collision occurred, at the time of, prior to, and for several days after the collision and sinking.

The evidence further established that the Cooper was of wood construction; that she had been built during the year 1882; that there were no other wooden boats of the same vintage which remained operative anywhere in the United States in fresh water. There was some indication that there were other wooden boats built at about the same date as the Cooper which were still in operation, but that these boats were operated in salt water, which has a tendency to preserve the texture and the condition of the timbers while fresh water has a tendency to cause dry rot.

The evidence further disclosed that the hull of the Cooper suffered from considerable dry rot; that the Cooper had originally been a steam vessel and had been converted to diesel power; and that a diesel engine causes greater vibrations than does a steam engine. It was established that by virtue of the vibrations of the diesel engine the caulking between the timbers on the Cooper frequently pulled away and it was necessary that it be replaced by the crew. It was also established that during the course of her many years of service a number of the ribs in the Cooper had been cut and replaced; however, when these timbers were removed, the vessel was not in as strong a condition as she previously was. It was also established that there were cables and turnbuckles in the hull of the Cooper which tended to keep her hull together. There was testimony to the effect that the metal bolts fastening the planking to the ribs were badly rusted and in some instances had come out and it was necessary to cut into the ribs and insert plugs into the holes, caused by the bolts coming out, in order to stop the leakage caused thereby.

A number of steel plates had been fastened to the outside of the Cooper's hull. The reason for this was not clearly established. The petitioner contended that the plates were placed thereon to strengthen the sides in case of a collision or coming into contact with barges or piers when tying up. Other witnesses testified it was necessary that the steel plates be fastened to the Cooper's hull to reinforce the hull and to assist in keeping the caulking from working loose. It was also established that the Cooper regularly utilized pumps to remove water seeping into its hull and that it was necessary to pump out the water at frequent intervals.

Sometime prior to the collision which caused the Cooper to sink, it had come into contact with some rocks which knocked a hole in the side of the vessel. It was dry docked and this hole repaired by replacing the damaged timbers.

There was testimony to the effect that the steering apparatus on the Cooper permitted it to stray on its course or in the terminology of the witness to "walk" permitting the Cooper and its tow to go off course.

In maneuvering water borne vessels the only method of halting the direction of movement is by changing the direction in which the screw is moving. If the vessel is moving forward, then the screw on the vessel must be placed into reverse to slow the speed of the vessel and bring it to a halt. In the case of the Cooper, when it was moving forward, it became necessary to stop the engine, then wait until the drag of the engine had stopped the movement of the screw; the engine then had to be restarted in the opposite direction before it became possible to apply any braking movement. The testimony concerning the time within which it was possible to apply the rearward or braking effect to the Cooper varied from fifteen seconds to more than a minute. Considering that the vessel was traveling forward under its own power and that the current was eight to ten miles per hour, the forward movement of the vessel and its barges would necessitate a great amount of time to bring it to a halt or even slow its forward movement. Even if only fifteen seconds were needed within which to commence the braking action of the Cooper, a great amount of valuable time would have been lost and a considerable distance would have been traversed before the Cooper could even commence to halt its forward movement.

The evidence established that the Cooper had a 360 h. p. diesel engine installed. There was some testimony to the effect that the horse power of the Cooper had been increased by modification so that it was able to deliver a maximum of 400 h. p.

Mr. Paul H. Blair, naval architect, marine engineer and naval surveyor, who was called and qualified as an expert witness, testified that in his opinion the Cooper was underpowered for the type of work she was called upon to do; that in order to have maneuvered the four barges and the vessel itself under the conditions that existed at the time of the collision, it would have been necessary that the boat have a minimum of 650 h. p.

The lifeboat on the Cooper was not provided with a davit to remove it from the boat, but it had to be picked up and manually shoved off; this lifeboat was not watertight and soon filled with water.

One of the survivors testified that after the collision he jumped off the boat and encountered another member of the crew and Lusk; that they were at the lifeboat; that the lifeboat was full of water; that they stayed with Lusk until the lifeboat capsized; that he and his shipmate then lost contact with Lusk and were unable to recover him from the water.

One of the survivors testified that just prior to the collision he was in the engine room and felt the impact of the boat as it struck the pier; that he came up on deck and saw the barges coming back alongside the Cooper; that the boat was already listing badly and the water was pouring over the sides and into the Cooper. He testified that for some minutes prior to the collision the engine had been reversed and was in full reverse at the time the Cooper collided with the pier.

Walter Detrick, a professional diver, testified that he had been called upon to remove the bodies from the Cooper and to inspect the hull; that he did remove one of the bodies but was unable to find any others; that in the course of his investigation and inspection he found that one entire side of the stateroom had collapsed and further found that one plank about eight feet long and two feet wide had been torn out and a big opening left in the hull.

■ The evidence clearly established that the hull suffered from substantial dry rot because of the advanced age of the vessel; that the ribs were weakened; that the hull was prone to leak; that it was necessary to operate the pumps frequently to remove water from the hull; that the lifeboat was completely useless as such; that the steering mechanism was not in good working condition; and that the diesel motor was not adequate to provide the necessary power to the Cooper to manipulate her tows in a satisfactory manner.

Considering all of the above, the Court cannot say that the Motor Vessel Anna S. Cooper was a seaworthy vessel; on the contrary, considering the numerous deficiencies in the M/V Anna S. Cooper, one is inescapably drawn to the conclusion that the M/V Anna S. Cooper was unseaworthy and that her condition was or should have been within the knowledge of the petitioner.

The petition for limitation of liability must be denied.

The Cooper was one of the remnants of a bygone era of wooden vessels. Through her many years of service in both salt and fresh water (her latter years being spent in fresh water), she had become structurally weak and physically decrepit and could not cope with the rigors of navigating stormy waters. She was like the "One Horse Shay"—when she went, she went fast.

The petitioner's assertion that the Anna S. Cooper was capable of plying her trade under normal circumstances and that she was in a seaworthy condition to perform the duties she was called upon to perform in her normal operations is not borne out by the evidence. Rather, the Court finds that the Anna S. Cooper was unseaworthy in a number of different ways as is more fully set out hereinabove.

Having found that the petitioner is not entitled to exoneration from or limitation of its liability in this cause, the Court will next consider the claims presented.

■ Pleasant M. Lusk, Jr., was approximately thirty-eight years of age at the time of his death. He was a pilot and from the testimony it appears he was a capable pilot. His salary for 1952 was $2,955.00 and for 1953 was $3,650.00. The figure of his 1954 salary was to be furnished by the parties, which they failed to do.

The parties stipulated that on March 24, 1955, a pilot's monthly compensation was $400.00 and that since that time a pilot's pay has increased at the rate of $30.00 per month per year to the date of trial. His burial expense was $980.00. He left him surviving his widow and three children, ages approximately seven years, five years and sixteen months respectively. His life expectancy, according to 1956 United States Life Tables, was 36.2 years. His expected work life, assuming age 65 as the end of his working life, was approximately 27 years. There was testimony that he was a good husband and father and that he performed chores around the home for his wife; that he was mindful of his children and assisted his wife in providing instruction and guidance for them. Mary Lusk, the deceased's widow, testified that he used approximately $5.00 a week for his own expenses and the balance was contributed to his family for their support.

Considering the amounts which Lusk probably would have earned in 1955 and thereafter for the next 27 years of his work life and assuming that he would have continued his attentiveness to his family and the same average contribution to their care, nurture, guidance and training, the Court finds that he would have provided monetary income for his family in approximately the following amounts: $4,000.00 during 1955, $4,260.00 during 1956, $4,520.00 during 1957, $4,780.00 during 1958, $5,040.00 during 1959, and would have provided an average of $5,600.00 annually thereafter until such time as the youngest child became of age. Thereafter, the Court finds that he would have provided approximately $4,000.00 per year during his remaining working years for the care and support of his wife.

In order to arrive at the amount which Mary T. Lusk, administratrix of the estate of Pleasant M. Lusk, Jr., deceased, is entitled to, the average annual amount as set out above has been computed, to which was added interest at the rate of four per cent per annum to date, and for each year thereafter there has been deducted an amount equal to four per cent per annum of the amount which he would have contributed had he lived and also the income tax which he would have been required to pay; and the Court finds that the total amount of earnings he would have contributed to his family is $81,150.00.

■ The propriety of allowing pre-judgment interest may be questionable and debatable, but if the plaintiff is entitled to damages because of the loss of her husband and the father of her children, her financial loss began at the instance of his death. The only way she can be made whole (if such is possible under the circumstances) is to pay her the amount of her loss immediately upon the happening or, otherwise stated, to allow her interest from the date of the loss to the date of the payment. This, in the opinion of the Court, is only fair and reasonable. Therefore, the Court allowed pre-judgment interest as above provided.

The Court further finds that Lusk would have provided care, nurture, guidance and training to each of his children during their minority. It is impossible to measure loss of love, affection, care and training in dollars and cents, yet a monetary value for such loss must be fixed, which the Court does hereby find to be as to Judi Lusk the amount of $5,720.-00, as to Stephen Lusk the sum of $7,520.-00, and as to Sybil Lusk the sum of $7,-520.00, which several amounts are due and payable to the administratrix for the use and benefit of the several minor children of the deceased in the amounts specified.

It was stipulated that his funeral expense was $980.00. There would, therefore, be due to the administratrix the sum of $980.00 plus interest at the rate of four per cent per annum to date, for a total of $1,215.20.

The Court finds that the aggregate damages to be awarded to Mary T. Lusk, administratrix of the estate of Pleasant M. Lusk, Jr., deceased, are $103,125.20.

■ Robert Anderson was born December 18, 1936 and at the time of the accident was slightly over 18 years of age. He commenced working for the petitioner on January 1, 1955 and continued such work until the date of his death on March 24, 1955. During this period of time he had earned $628.99 from work for the petitioner and had earned the sum of $45.38 from othe. sources. He had previously been enː ployed as a sawmill worker, earning approximately $6.00 a day.

It was stipulated that the earnings oɪ a deck hand on March 24, 1955 were $250.00 a month and that there had been increases in deck hand wages at the rate of $25.00 per month each year until the time of the trial so that at the time of the trial in this cause a deck hand was being paid approximately $425.00 per month.

Robert Anderson lived at home with his parents and his minor brother when he was not away on the boat. His father testified that he contributed about a third of his income toward the support of his mother and father and his minor brother. According to the testimony, he was a very industrious young man and a conscientious worker.

His funeral bill was $1,058.91.

The Court finds that in all probability, based on the testimony, Robert Anderson would have continued to contribute to the support of his mother and father and minor brother for approximately seven years had he not met his death and that in all probability he would have contributed an average of $1,000.00 per year toward such support. In arriving at the amount to be awarded to Richard Anderson, administrator of the estate of Robert Anderson, interest at the rate of four per cent per annum from the date of death to the date of trial has been added.

Damages in the amount of $7,840.00, including interest, are hereby awarded for the death of Robert Anderson. Interest at the rate of four per cent per annum on the amount of the funeral bill from the date of death is added to the funeral bill, making a total of $1,313.07. The Court further finds that the aggregate amount to be awarded to Richard Anderson, administrator of the estate of Robert Anderson, deceased, is $9,153.07.

The above and foregoing shall be considered findings of fact and conclusions of law.

Parties to settle the order.