Clay **SYLVE**, Plaintiff,

v.

**E. W. GRAVOLET CANNING COM-
PANY, Inc., Defendant.**

Civ. A. No. 15918.

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 23, 1967.

670

Robert L. McLaughlin, Orlando G. Bendana, New Orleans, La., for plaintiff.

Eldon T. Harvey, III, H. Barton Williams, New Orleans, La., for defendant.

CASSIBRY, District Judge.

This is a suit for damages based on unseaworthiness under the general maritime law, negligence under the Jones Act, 46 U.S.C. § 688 et seq., and maintenance and cure. The action arose out of an explosion and flash fire aboard the oyster boat *Marguerite A* while it was moored to a dock in the Gravolet Canal in Pointe-a-la-Hache, Louisiana, on the morning of May 11, 1965. The defendant denied liability and, in the alternative, prayed for limitation of liability. The case was tried to the Court on July 26 and 27, 1967.

At all material times, the *Marguerite A* was owned and operated by defendant Gravolet. The *Marguerite A* is typical of vessels engaged in oyster planting and harvesting in this area.[1] It is 42.7 feet in length, 14.9 feet in beam, powered by a Chrysler marine gasoline engine and has a wooden hull. The engine compartment is located below the main deck in the forward part of the vessel. There is a hatch on the forecastle that gives access to the forward part of the engine room to facilitate fueling. Approximately two-thirds of the way aft on the main deck is a deck house that gives access to the after section of the engine room and also serves as a pilot house. The *Marguerite A* was acquired by Gravolet in 1952 in a used condition; it is one of 8 or 10 oyster boats he owns in connection with an oyster canning operation carried on in Pointe-a-la-Hache on the banks of the Gravolet Canal.

To clarify the situation, an explanation of the geography of this particular location is in order. The Gravolet Canal is a man made, navigable stream which was created some years ago by the defendant's father in furtherance of his oyster canning operation. The land on both banks of the canal is owned by Gravolet. The purpose of the canal is to allow easier access to the canning factory by the oyster boats, and to serve as a base of operations for the boats. Along the banks of the canal are located gas pumps for fueling the boats, a general store owned by Gravolet, the canning factory and a shipyard, for repair of the boats, also owned by Gravolet. The home and law office of Gravolet are located about two blocks from the canal.

At the time of the accident, the crew of the *Marguerite A* consisted of Clay Sylve, an illiterate with no formal education, who functioned in the capacity of deckhand, and Eddie Williams who was the master. Eddie Williams had a third grade education.

The *Marguerite A* had been rebuilt several months prior to the date of the accident. The rebuilding took place in the shipyard owned by Gravolet and was done by persons in the employ of Gravolet. During the rebuilding, the *Marguerite A* was equipped with a new fuel system. The fuel system aboard the *Marguerite A* consisted of two interconnected fifty-five gallon drums lying on their sides in wooden cradles. The fuel drums were located in the forward section of the engine room directly below the forecastle access hatch. There were no transverse bulkheads between the fuel tanks and the after end of the engine room. The tanks were filled by passing a hose through the access hatch and pumping fuel into the tanks through a bung hole in the top of one tank. The tanks had no protection device to guard against overflow of gasoline into the bilges in case of overfilling. There was no device inside the tank to reduce turbulence while the tank was being filled. The tanks were not vented to the outside atmosphere in any way. The only provision made to vent the fuel tanks was a small hole in the top of the bung hole cover that allowed gasoline fumes to escape into the engine room. The engine room was not equipped with a forced air blower system, but instead depended upon natural air flow through open hatches for ventilation.

The *Marguerite A* was further equipped with a new, Briggs & Stratton, portable, magneto ignition, gasoline powered pump commonly called a "handy billy." This type of pump, even when equipped

---

1. See Plaintiff Exhibits T-1, T-2, T-3 and T-15.

with a muffler, as this one was, occasionally throws off sparks when started. The primary purpose of the "handy billy" was to pump out accumulated bilge water. Mr. Terry, a marine surveyor, testified that it is considered an unsafe practice to operate pumps of this nature below decks. However, both the master and Sylve customarily operated this pump below decks in the engine room. Neither had ever been instructed that this was unsafe and apparently were not aware of the danger of this practice.

On the morning of May 11, 1965, the *Marguerite A* was moored to a dock in the Gravolet Canal adjacent to the gas pump and general store. In preparation for making a trip to the oyster beds, the master started the bilge pump and fueled the vessel. He claims that he did not overflow the fuel tanks during fueling. Sylve was not aboard the vessel at this time. After it was fueled, the vessel was moved about 100 yards to another dock to make way for other vessels to be fueled. The master left the *Marguerite A* to obtain ice and other supplies. During his absence, the bilge pump stopped for undetermined reasons. At this point, Clay Sylve came aboard and, as was his custom, went below to inspect the bilge. Seeing water there, he decided to start the bilge pump. At this time the forecastle access hatch was closed. The bilge pump was not refueled by Sylve. On Sylve's second attempt to start the pump there was an explosion and flash fire. One engine room door was torn loose by the explosion, but the vessel suffered no other damage. Clay Sylve, however, was injured severely.

The captains of the oyster boats worked the boats on shares. They were held responsible to the defendant for the proper maintenance of the vessels. However, the captains of the vessels took the boats as Gravolet provided them, and had no authority to make major alterations without the permission of Gravolet or one of his assistants. Eddie Williams was made captain of the *Marguerite A* after it had been rebuilt and thus had no say in the installation of the fuel system.

Despite the fact that the *Marguerite A's* base of operations was located in the midst of the defendant's multiple activities and the defendant had ample opportunity to inspect the vessel, it is undisputed that Gravolet at no time inspected the *Marguerite A*. Gravolet testified that he left the operation of all his oyster boats up to his foreman, the captains and his mechanic, all of whom he considered competent. The only testimony concerning the foreman was to the effect that he also had never inspected the vessel. The "competent mechanic" referred to by Gravolet was Joseph C. Williams, the man who installed the fuel system presumably at the direction of either the foreman or Gravolet. Joseph Williams was a part time bus driver and mechanic who worked for Gravolet by the hour. He had a third grade education and had received no formal training in the field of engine repair or mechanical installation. Gravolet issued no standing orders concerning repair of his vessels; there was no regular program of safety inspection or maintenance in force and the only program of safety instruction in force was to warn those concerned to "be careful."

■ The Court agrees with and accepts the expert opinion of Mr. Terry, the marine surveyor, that the proximate cause of the explosion and flash fire aboard the *Marguerite A* was the ignition of gasoline vapors which had accumulated in the bilge after the fueling of the vessel.

■■ The Court further finds that the accumulation of gas vapors was due to inherent defects in the fuel system installed on board the *Marguerite A*, and that the spark that caused ignition of those vapors came from the muffler of the bilge pump. The unsafe use of the bilge pump in the engine room can be attributed to the captain's ignorance of, and his failure to adhere to safe operating procedures; the failure of the owner or his foreman to instruct the captain and Sylve in the dangers inherent in using the pump in the engine room.

Since Sylve was a person of no education and low intelligence (Gravolet testified that Sylve was mentally retarded), and had never been instructed that starting the bilge pump below decks was unsafe, the Court finds that the explosion and flash fire were in no way caused by the fault or negligence of Clay Sylve.

The *Marguerite A* was unseaworthy in at least two respects, in that it was equipped with an inherently unsafe fuel system and it was placed under the command of an incompetent master. In allowing these conditions to exist, Gravolet negligently breached his duty to the plaintiff to provide him with a safe place in which to work.[2]

A seaman is entitled to recover from a shipowner for injuries caused by the unseaworthiness of a vessel. The shipowner's liability for unseaworthiness is absolute.[3]

As an alternative defense to this action, the defendant has pleaded that he should be allowed to limit his liability to the value of the vessel under 46 U.S.C. § 183. The value of the vessel was stipulated to be $3,000.00. Limitation of liability of the owner of a vessel comes into play only where the injury was occasioned by acts done without privity or knowledge of the owner.[4] "Privity," within the limitation of liability statute, means personal cognizance or participation in fault or negligence which causes the loss, and the term "knowledge," means not only personal cognizance but also the means of knowledge of which a party must avail himself in order to prevent a condition likely to produce or contribute to a loss.[5] There can be no limitation of liability where the shipowner knew or should have known that his ship was unseaworthy due to some unsafe condition, or that it was improperly equipped or manned.[6] Further, the owner is deemed to have privity and knowledge where he had means of knowledge or where knowledge would have been obtainable from reasonable inspection.[7]

In view of the fact that every act and omission leading up to the tragedy of May 11, 1965, took place in the very center of Gravolet's base of activity and that the slightest effort at inspection or instruction either by him or his foreman would have disclosed the unsafe conditions and prevented the unsafe practices which led to the accident, Gravolet is chargeable with privity and knowledge of the unseaworthiness of his vessel and may not limit his liability to the value of the vessel.

Following the explosion and fire, Sylve was taken to Charity Hospital in New Orleans, Louisiana, where he was placed under the care of Dr. Haddad. Dr. Haddad was the only medical witness to testify at the trial.

Sylve suffered severe burns over approximately 50 percent of his body, and approximately 30 percent of the burns were of the third degree. The burns on his hands were so severe that he will no longer be able to engage in any type of manual labor. Sylve spent 317 days as an in-patient in Charity Hospital and was treated as an out-patient for 481 days until reaching maximum cure on July 19, 1967. During his hospitalization it was necessary to perform a tracheotomy, plus at least five skin graft operations. Sylve's physical pain and suffering while hospitalized were so intense that large doses of narcotics were required to ease

2. Bryant v. Partenreederei-Ernest Russ, 330 F.2d 185 (4th Cir. 1964).

3. Mahnich v. Southern S.S. Co., 321 U.S. 96; 64 S.Ct. 455, 88 L.Ed. 561.

4. Petition of H. & H. Wheel Service, 219 F.2d 904 (6th Cir. 1955).

5. Greater New Orleans Expressway Commission v. Tug Clarabel, 222 F.Supp. 521, aff'd Coleman v. Jahncke Service, Inc., 341 F.2d 956, rehearing denied 348 F.2d 868 (5th Cir. 1965).

6. Petition of Midwest Towing Co., 203 F. Supp. 727, aff'd Midwest Towing v. Anderson, 317 F.2d 270 (7th Cir. 1963).

7. China Union Lines, Ltd. v. A. O. Anderson & Co., 364 F.2d 769 (5th Cir. 1966).

them. In addition to complete disability in his hands, Sylve is 35–40 percent disabled as to the rest of his body. Dr. Haddad testified that, because of the severe trauma he suffered, Sylve's natural life span has probably been shortened. As a result of the scars resulting from the burns and skin graft, that cover his body, Sylve is horribly disfigured and will remain so for the rest of his life causing him great mental anguish.

At the time of the accident, Sylve was 34 years old with a normal life expectancy from the American Mortality Table, Louisiana Revised Statutes 47:2405, of 32.50 years. His earnings had averaged $1,800.00 per year. He is illiterate, with no formal education; thus the loss of ability to perform manual labor has rendered him unemployable.

■ The shipowner's liability for maintenance and cure is among the most pervasive of all his liabilities.[8] Further, maintenance and cure must be provided an injured seaman even though that seaman is not normally furnished meals and lodging aboard the vessel.[9] In the instant case, defendant Gravolet has callously neglected his obligation to provide Sylve with maintenance since Sylve has received no maintenance at all. Unpaid medical bills from Charity Hospital received in evidence total $6,042.40. This amount will be recoverable in a direct action by Charity Hospital from the defendant Gravolet,[10] but not from plaintiff. Therefore, plaintiff may not recover in this suit the Charity Hospital charges. Because of the callousness displayed by Gravolet in his failure and neglect to pay maintenance and cure, attorney fees in the amount of $1,500.00 will be awarded to the plaintiff.[11]

■ The plaintiff is entitled to a judgment in his favor and against the defendant E. W. Gravolet, Jr., as follows:

| | |
|---|---:|
| Maintenance at $8.00 per day for 481 days as an outpatient until reaching maximum cure | $ 3,848.00 |
| Attorney fees for callous neglect to pay maintenance and cure | 1,500.00 |
| Loss of earnings from date of accident to date of trial | 3,975.00 |
| Loss of future earnings | 28,091.95 |
| Physical pain and suffering | 80,000.00 |
| Future mental anguish | 10,000.00 |
| Total | $127,414.95 |

Loss of future earnings was computed by assuming annual earnings of $1,800.00 per year as stipulated by the parties, discounting this figure at 5 percent on a yearly basis, using document number 132, Am.Jur.2d, Desk Book, over a period of 31.07 years, the life expectancy of the plaintiff at the date of the trial, using the American Experience Mortality Table, LSA–R.S. 47:2405.

The judgment is to bear interest from date of judicial demand, and defendant is to pay all costs of these proceedings.

The Clerk will prepare a judgment accordingly.

8. Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

9. Weiss v. Central Railroad Co. of New Jersey, 235 F.2d 309 (2nd Cir. 1956); City of Avalon, 156 F.2d 500 (9th Cir. 1954); Hudspeth v. Atlantic & Gulf Stevedores, Inc., 266 F.Supp. 937 (E.D. La.1967).

10. Louisiana Revised Statutes 46:8 et seq.

11. Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).